**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANDRÉ JACOBS,          )
                       )
         Plaintiff,     )
                       )
         v.           )        Civ. A. No. 08-470
                       )
CITY OF PITTSBURGH, et al.,   )
                       )
         Defendants.   )

## AMENDED MEMORANDUM OPINION

CONTI, Chief District Judge

## I.    INTRODUCTION

Pending before the court are two motions for sanctions for spoliation of evidence filed by plaintiff André Jacobs ("plaintiff") against a host of defendants associated with the Allegheny County Jail ("ACJ") in Pittsburgh, Pennsylvania.[1] Plaintiff's first motion and brief in support relate to the alleged spoliation of ACJ records (the "Records motion"). (ECF Nos. 427, 428.) Plaintiff's second motion and brief in support relate to the alleged spoliation of ACJ video evidence (the "Video motion"). (ECF Nos. 425, 426.) Plaintiff filed exhibits accompanying the Records and Video motions. (ECF Nos. 430, 429.)[2] Defendants filed responses (ECF Nos. 441, 442), and a brief in opposition to

---

[1] The remaining defendants are: Detective Richard Usner; Detective Michael O'Keefe; Dan Onorato; William Emerick; Ramon Rustin; Ronald Pofi; Major Donnis; Lt. ACJ Louis Leon; Dale Chapman; Robert Beveridge; Bozak; Robbie Pindel; Kavals; McCall; Stanton; Rubel; and Crapis (collectively the "defendants").

[2] Plaintiff filed the same set of exhibits in support of both the Records and Video motions. *See* (ECF Nos. 430, 429.)

plaintiff's motions for sanctions.[3] (ECF No. 443.) Plaintiff filed a reply to defendants'

response. (ECF No. 445.) Having been fully briefed, plaintiff's Records and Video

motions are ripe for disposition.

_____

[3] In defendants' brief in opposition to plaintiff's motions for sanctions, counsel for defendants argues:

> It should be noted that [plaintiff] has previously filed a similar [m]otion for [s]anctions, [*see* (ECF No. 378),] which was subsequently dismissed by [the court] on or about February 12, 2015. [*See* (ECF No. 418 at 14:3–25.)] Despite this dismissal, [plaintiff] has filed the instant [motions for sanctions], which contain no additional substantive averments, seeking spoliation sanctions against the remaining [d]efendants.

(ECF No. 443 at 2.) To support this contention, defendants' counsel cites the transcript of a February 12, 2015, status conference, in which the court and plaintiff engaged in the following exchange:

> The court:     We do have an outstanding motion for sanctions. A lot has happened since that motion was filed in terms of things being produced and everything that has transpired. So, [plaintiff], do you wish to continue to pursue your motion for sanctions?

> Plaintiff:     Absolutely, Your Honor. And from the hearing that we had, you said that we could brief that issue after all of the materials, you know, and with the depositions you said you wanted me to point to specific points in the depositions that support my position.

> The court:     What I'm going to do is because it may take you another 60 days or so to be ready to do this, because we still have a few dangling things out there, and things have changed a lot. So now you have certain things, and there were different issues that were raised in the initial motion. I'm going to deny that motion [for sanctions] without prejudice, and at the conclusion of the discovery, you will file a renewed motion for sanctions. Then  you can be specific about what the problem is and what sanction you feel is appropriate. And how does that sound?

While plaintiff may have proved defendants were negligent—or even grossly negligent—he failed to prove by a preponderance of the evidence that defendants intentionally withheld the ACJ records in bad faith. Plaintiff's Records motion will, therefore, be denied.

Because plaintiff failed to prove by a preponderance of the evidence that the alleged video evidence existed in defendants' control, plaintiff's Video motion will be denied.

## II.  PROCEDURAL HISTORY

Plaintiff is a state prisoner incarcerated at the State Correctional Institution of Albion in Albion, Pennsylvania. On April 7, 2008, plaintiff brought this action *pro se* against defendants alleging constitutional and state law violations occurring during his incarceration at the ACJ between an unspecified date in April 2005, and September 27, 2006. (ECF Nos. 1, 55.) The instant sanctions motions concern discovery materials plaintiff sought from defendants. In both the Records and Video motions, plaintiff requests that the court sanction defendants with an adverse inference instruction, the suppression of evidence, and plaintiff's costs and fees. (ECF No. 428 at 3; ECF No. 426 at 3.)

---

Plaintiff:      That's cool.

(ECF No. 418 at 14:3–25.) At this hearing, the court made clear it was not dismissing plaintiff's previous motion for sanctions on the merits. Defendants, therefore, mischaracterize the record to support their position with respect to the instant sanctions motions filed by plaintiff. Defendants are hereby warned that future mischaracterizations of the record will be stricken.

### III.  STANDARD OF REVIEW

The party seeking sanctions bears the burden of proving spoliation of evidence occurred. *Universal Underwriters Ins. Co. v. Dedicated Logistics, Inc.*, Civ. A. No. 11-1153, 2014 WL 7335668, at *4 (W.D. Pa. Dec. 19, 2014). Spoliation of evidence occurred if: (1) the evidence was in defendants' control; (2) the evidence is relevant to plaintiff's claims; (3) there has been actual, intentional suppression or withholding of evidence in bad faith[4]; and (4) the duty to preserve the evidence was reasonably foreseeable to defendants. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)).

If the party seeking sanctions proves spoliation, the court may sanction the offending party. *Dunn v. Mercedes Benz of Ft. Wash., Inc.*, Civ. A. No. 10-1662, 2012 WL 424984, at *4 (E.D. Pa. Feb. 12, 2012) (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78–79 (3d Cir. 1994)). To determine the appropriate sanction, the court must consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the party seeking sanctions; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the aggrieved party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. *Schmid*, 13 F.3d at 79; *Bull*, 665 F.3d at 73 n.5 (quoting *Schmid*, 13 F.3d at 79). Potential spoliation sanctions include dismissal of a claim or granting

---

[4] The "intentional withholding in bad faith" requirement is discussed in detail *infra*, part IV.1.B.iii.

judgment in favor of the prejudiced party, suppression of evidence, an adverse inference instruction that the spoiled evidence was harmful to the offending party's case, fines, and attorneys' fees and costs. *Anderson v. Bd. of Sch. Dirs. of Millcreek Twp. Sch. Dist.*, Civ. A. No. 07-111, 2013 WL 4455496, at *33 (W.D. Pa. Aug. 16, 2013).

## IV.    DISCUSSION

As the party seeking sanctions, plaintiff bears the burden of proving spoliation of the ACJ records and the September 21, 2006, video at issue in this case. *See Universal Underwriters Ins. Co.*, 2014 WL 7335668, at *4. With respect to both the Records and Video motions, plaintiff must satisfy the *Bull* factors of: (1) control; (2) relevance; (3) actual, intentional suppression or withholding in bad faith; and (4) a reasonably foreseeable duty to preserve. *Bull*, 665 F.3d at 73.

The court will set forth the relevant factual background and address the merits of plaintiff's Records and Video motions in turn.

### 1.    The Records motion

#### A.    Factual background

Relevant to plaintiff's Records motion, plaintiff asserts certain of defendants "lost or destroyed" records of "prior [inmate] grievances and internal investigations into uses of force against prisoners at [the ACJ]" during the timeframe relevant to plaintiff's lawsuit. (ECF No. 427 at 1, 3.) Plaintiff claims that while defendants provided him "thousands of pages worth of reports and investigative records" involving "claims by inmates against inmates" and "[ACJ] staff against inmates," defendants failed to provide plaintiff any "grievances, investigative files, . . . interviews[,] or any other internal [ACJ]

records" that "represent *the prisoner's* version of an altercation with staff." (ECF No. 428 at 5 (emphasis in original).)

In particular, plaintiff takes issue with defendants' failure to produce ledgers and internal affairs documents in which ACJ officials allegedly kept internal records of inmate grievances, including excessive force grievances, filed by inmates against ACJ staff. (*Id.* at 8.) The court will set forth the background information relevant to the ledgers and internal affairs documents in turn.

### i.     Background concerning the ledgers

At an October 4, 2014, evidentiary hearing, plaintiff cross-examined defendant ACJ Deputy Warden William Emerick ("Emerick") with respect to the grievance ledgers in the following manner:

Q:    How long have you been working at [the ACJ]?

A:    Thirty-two years and seven months.

Q:    At any point were you responsible for overseeing the inmate grievance system at [the ACJ]?

A:    As the Assistant Deputy Warden at the time, . . . I would have been one of the ones responsible for overseeing it in my position.

. . .

Q:    . . . Did you maintain or did you create or maintain the records pertaining to the grievances?

A:    No. That would have been the responsibility of the grievance officer.

Q:    So could you give us any insight on how these records [relating to grievances filed by inmates at the ACJ] were maintained?

. . .

A:     Yeah. There would be a ledger made of the grievance, which would include the date that the complaint was filed, the topic, the inmate that [*sic*] is filing the grievance and the disposition of the grievance.

Q:     Would there be an identification number like a tracking number?

A:     Yeah. They would be by year and month.

Q:     Who enters that information in the ledger?

A:     Whoever was assigned to do the inmate grievances.

Q:     And do you know who that person was for the period of 2007, [20]06, [20]05, [20]04?

A:     No, I do not recall.

Q:     Okay. What happens to the ledgers after they're made?

. . .

A:     They would be maintained by the grievance officer.

Q:     Would they be maintained by [the ACJ]?

A:     Yes.

Q:     And is there a certain period of time that they're maintained?

A:     No. They're not.

Q:     So for the years 2007, [20]06, [20]05, [20]04 and [20]03, [the ACJ] would still have these grievance records; correct?

A:     Well, [plaintiff], we did a—you know, we did a diligent search to try to locate the ledgers. There was [*sic*] a lot of manpower hours put in to try to locate them, and they were not located. They must have been mistakenly lost.

Q:     Does [the ACJ] have grievance ledgers for any period from 1996 to 2006? That's a ten year period.

A:      No. We do not.

. . .

Q:      Does [the ACJ] have any documentation which verifies that the grievance ledgers were actually maintained at any time prior to 2007? I'm not saying you have the actual ledgers, but do you have any other documentation showing that these ledgers were actually maintained, were ever in existence?

A:      No, I do not.

(ECF No. 394 at 24:24–25, 25:1–9, 26:12–25, 27:1–25, 28:1–4, 29:15–21.)

With respect to the ACJ ledgers, plaintiff included in his exhibits an April 13, 2005, version of the ACJ's "Administrative Directive #14," which provides the ACJ's internal inmate complaint procedures (the "2005 grievance directive"). (ECF No. 429-18 at 4–7.) The 2005 grievance directive provides that an ACJ "grievance officer" "shall maintain a ledger" recording the names of complaining inmates, the complaint file numbers, the subject matter of the complaints, the complaint receipt dates, and the dates on which ACJ staff answered the complaints. (*Id.* at 6.)

## ii.      Background concerning the internal affairs records

In plaintiff's May 28, 2014, deposition of former ACJ internal affairs employee Ronald Pofi ("Pofi") (ECF No. 379-7), plaintiff examined Pofi with respect to the internal affairs documents at issue in the following manner:

Q:      . . . [A]m I correct in saying that your primary focus on investigations was, like, internal investigations of [the ACJ]?

A:      Yeah, I was involved in anything that would—any contraband that would maybe come into the jail, employees, investigate employees; people escape from programs, we took care of that. Many different things.

Q:     What about inmate abuse allegations? . . .What about claims made by inmates that use of force was used against them by an [ACJ] employee?

A:     Well, it depends on what the reports say. . . . [I]f it seemed like it was something criminal, that would be turned over to the county [police officers working in the ACJ's internal affairs department]. . . . [W]e'd have to read the reports and see what they have to say. Sometimes they'd go up and talk to the inmate and see what they have to say, and, you know, if I could take care of it, fine; if I can't, then it was turned over.

Q:     So if an inmate sent you a complaint saying, you know, on such-and-such a date, an officer punched me in the face, what did you do?

A:     I probably would get a report from the officer first, if he filed a report. If not, I'd have to talk to the officer first, and I may talk to the inmate, depending on the circumstances.

Q:     And would that constitute an investigation?

A:     Probably.

Q:     And would that investigation be documented?

A:     It should be.

Q:     How do you track situations where you would investigate inmate abuse allegations?

A:     There's [*sic*] reports made on it.

Q:     If you wanted to know how many complaints you received from inmates alleging abuse where an investigation was conducted, how would you find that out?

A:     There's [*sic*] records kept of that, of the complaint. There's a complaint officer[;] they're the first ones that [*sic*] take a look at that. . . .[T]hey read the complaints first and they investigate,  and  if they think it's warranted to turn it over to internal affairs, they turn it over to us. If they can take care of it themselves, they care of it themselves. . . .

(*Id.* at 6:25, 7:1–25, 8:1–21, 9:2–7.)

### B. Whether defendants spoiled the grievance ledgers and records

As the party seeking sanctions, plaintiff bears the burden of proving spoliation of the ACJ grievance ledgers and internal affairs documents during the time period relevant to this case. *See Universal Underwriters Ins. Co.*, 2014 WL 7335668, at *4. As stated previously, plaintiff must satisfy the *Bull* factors of: (1) control; (2) relevance; (3) actual, intentional suppression or withholding in bad faith; and (4) a reasonably foreseeable duty to preserve. *Bull*, 665 F.3d at 73. Each factor is addressed in turn below.

### i. Control

To show spoliation, plaintiffs must prove defendants exercised control over the grievance ledgers and internal affairs documents at issue. *Id.* at 73; *see First Senior Fin. Grp. L.L.C. v. Watchdog*, Civ. A. No. 12-1247, 2014 WL 1327584, at *4 (E.D. Pa. Apr. 3, 2014).

With respect to the ledgers, Emerick's testimony at the October 8, 2014, evidentiary hearing satisfies the court that the ledgers existed and were in Emerick's care, custody, and control during the timeframe relevant to this case. Emerick admitted he was "one of the ones responsible for overseeing" the ACJ's internal inmate grievance program and he "assigned somebody to oversee the grievance procedures." (ECF No. 394 at 25:2–9, 26:6.) Emerick admitted an ACJ grievance officer—the identity of whom he could not recall—created and maintained ledgers recording inmate grievances during the relevant timeframe. (*Id.* at 26:12–24, 27:3–7.) Emerick admitted that after searching for ledgers from the relevant timeframe, none were located and "[t]hey must have been

mistakenly lost." (*Id.* at 27:20–25, 28:1–4.) While Emerick testified he did not personally create, maintain, or possess the ledgers at issue, *see* (*id.* at 26:12–15), his admissions that he oversaw in part the ACJ's inmate grievance program from his position of authority and assigned ACJ staff to create and maintain the ledgers is sufficient to prove by a preponderance of the evidence that Emerick exercised "control" over them. *See Watchdog*, 2014 WL 1327584, at *5 (observing that a "[l]ack of physical possession does not necessarily negate a party's control over evidence" and discussing with approval a case in which "'authority and ability to control potential evidence'" constituted control) (quoting *Indem. Ins. Co. of N. Am. v. Electrolux Home Prods., Inc.*, Civ. A. No. 10-4113, 2011 WL 6099362, at *8 (E.D. Pa. Dec. 7, 2011))).

In addition, the court is satisfied that ACJ Warden Ramon Rustin ("Rustin") exercised control over the ledgers during the timeframe relevant to this case. At Emerick's May 21, 2014, deposition, Emerick testified that "[t]o the best of [his] recollection," the ACJ adhered to a January 24, 1996, grievance policy (the "1996 grievance directive") from 2004 to 2006, promulgated by then-warden Calvin Lightfoot. *See* (ECF No. 377-2 at 54:14–25, 55:1.) Plaintiff included the 1996 grievance directive as an exhibit to his Records motion. *See* (ECF No. 430-18 at 2–3.) Like the 2005 grievance directive,[5] the 1996 grievance directive provides that the ACJ "shall maintain a ledger" of

---

[5] Rustin's name appears on the heading of the 2005 grievance directive, which provides that the ACJ's grievance officer "shall" make inmate grievance ledgers. *See* (ECF No. 429-18 at 6.) The record is, however, devoid of evidence that Rustin or any of the named defendants implemented, enforced, or adhered to the 2005 grievance directive in maintaining the ledgers during the timeframe relevant to this case. At the October 8, 2014, evidentiary hearing, Emerick testified only that ACJ grievance officers recorded

inmate complaints. (*Id.* at 2.) Under the 1996 grievance directive, inmates were required to provide "the Warden" the "original [grievance] complaint"—which corresponded to the ledgers by number—in order to "appeal" the disposition of their grievances. (*Id.*) Because Emerick testified at his deposition that the 1996 grievance directive was in effect during Rustin's tenure as the ACJ's warden from 2004 to 2006—and the 1996 grievance directive allowed inmates to appeal to "the Warden"—the court concludes Rustin knew about, had authority over, and exercised "control" with respect to the inmate complaint program and, thus, the grievance ledgers at issue. *See Watchdog*, 2014 WL 1327584, at *5 (citing *Indem. Ins. Co. of N. Am.*, 2011 WL 6099362, at *8).

With respect to the internal affairs documents, the court is satisfied they existed and were in Pofi's care, custody, and "control" during the timeframe relevant to this case. Pofi admitted during his May 28, 2014, deposition that he received and documented

---

inmate grievances in the ledgers; he did *not* testify that ACJ staff did so *pursuant to* the 2005 grievance directive. The 2005 grievance directive is, therefore, irrelevant unless evidence is introduced to prove a "jury could reasonably find the conditional fact"—*i.e.*, that the ACJ and defendants adhered to the 2005 grievance directive in making the ledgers—"by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988); Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

After "examin[ing] all the evidence in the case," *Huddleston*, 485 U.S. at 690, the court concludes plaintiff failed to show that a reasonable jury could find by a preponderance of the evidence that any of the named defendants adhered to the 2005 grievance directive in maintaining the ledgers. The record does not contain evidence connecting Emerick's testimony at the evidentiary hearing about the creation of the ledgers to the 2005 grievance directive. Emerick testified at his deposition that "[t]o [the] best of [his] recollection," the ACJ adhered to the *1996* grievance directive from 2004 to 2006—not the 2005 grievance directive. *See See* (ECF No. 377-2 at 54:14–25, 55:1.) Consequently, the court will not consider the 2005 grievance directive for purposes of plaintiff's Records motion under Federal Rule of Evidence 104(b).

reports of inmate complaints from ACJ grievance officers and either investigated the matters in his capacity as an ACJ internal affairs employee or turned them over to county police officers working in internal affairs. *See* (ECF 379-7 at 7:10–25, 8:1–25, 9:2–7.) Plaintiff proved by a preponderance of the evidence, therefore, that Pofi exercised "control" over the internal affairs grievance documents at issue, as required by *Bull*.

The record is, however, devoid of evidence that the other individual defendants—apart from Emerick, Rustin, and Pofi—exercised "control" over the ACJ ledgers or internal affairs records at issue in this case.[6]

### ii.     Whether the ledgers and records are relevant

To show spoliation, plaintiff must prove the grievance ledgers and internal affairs records are relevant to his claims against defendants. *Bull*, 665 F.3d at 73. Plaintiff argues the ledgers and records are relevant to his claims because they "contain evidence . . . that the supervisory [d]efendants in this case were on notice of patterns of excessive force" occurring at the ACJ during the relevant timeframe. (ECF No. 428 at 13.)

The court concludes the ledgers are relevant only with respect to plaintiff's 42 U.S.C. § 1983 ("§ 1983") claims for personal supervisory liability under the Constitution against Emerick, Rustin, and Pofi. To render Emerick, Rustin, or Pofi personally liable for constitutional violations under § 1983, plaintiff will be required to prove they: (1) participated in violating plaintiff's constitutional rights; (2) directed others to violate plaintiff's constitutional rights; (3) knew of and acquiesced in their subordinates'

---

[6] The other defendants are Detective Richard Usner; Detective Michael O'Keefe; Dan Onorato; Major Donnis; Leon; Dale Chapman; Robert Beveridge; Bozak; Robbie Pindel; Kavals; McCall; Stanton; Rubel; and Crapis.

violation of plaintiff's rights; or (4) knew of and tolerated past or ongoing misbehavior. *Jacobs v. City of Pittsburgh*, Civ. A. No. 08-470, 2010 WL 3397525, at *1 (W.D. Pa. June 21, 2010), *report and recommendation adopted*, 2010 WL 3397523 (W.D. Pa. Aug. 26, 2010) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91, 1191 n.3 (3d Cir. 1995)). The missing ledgers and internal affairs documents—with respect to which Emerick and Pofi testified contain specific information about ACJ inmates' grievances against ACJ staff—could be relevant to show whether Emerick, Rustin, or Pofi "knew of, and tolerated, past or ongoing misbehavior" on the part of ACJ staff. *See Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60, 72 (3d Cir. 2011) ("'It is . . . possible to establish [§] 1983 supervisory liability by showing a supervisor tolerated past or ongoing misbehavior.'" (quoting *Baker*, 50 F.3d at 1191 n.3)). Plaintiff, therefore, proved by a preponderance of the evidence that the grievance ledgers and records are "relevant" with respect to his § 1983 supervisory liability claims against Emerick, Rustin, or Pofi, as required by *Bull*.

### iii. Whether there has been actual suppression or withholding in bad faith

Plaintiff must prove by a preponderance of the evidence that Emerick, Rustin, or Pofi "actual[ly] suppress[ed] or with[held]" in bad faith the ACJ grievance ledgers and internal affairs documents at issue. *Bull*, 665 F.3d at 73. Because the facts of *Bull* are essential to understanding the bad faith "suppression or withholding" requirement, the court summarizes *Bull* below.

### a. *Bull*

In pursuit of reinstatement by her employer after an injury, the plaintiff in *Bull* obtained two original doctor's notes from her physician and faxed them to her union representative, who in turn faxed the notes to the plaintiff's employer. *Bull*, 665 F.3d at 70–71. The employer found "numerous inconsistencies" with the faxed notes and mailed a letter to the plaintiff's union representative requesting the original notes from the plaintiff. *Id.* at 71. In response to the letter, the union representative asked the plaintiff for "more information," but the plaintiff never responded and, instead, filed suit against the employer. *Id.*

During trial, the plaintiff sought to introduce a copy of one of the doctor's notes, and the employer objected on the basis of best evidence. *Id.* When asked about the original note's location, the plaintiff revealed it was at her home. *Id.* In open court, the district judge asked the plaintiff: "[T]his case has been going on for years. There were years of discovery. This note was asked for. Is there some reason—have you made a search for it previously?" *Id.* at 72. The plaintiff responded, "No, sir." *Id.*

Because of the plaintiff's revelations during the trial, the district court declared a mistrial, and invited the employer to file a motion for spoliation sanctions. *Id.* In ruling on the motion, the district court concluded that in light of the employer's request to the union representative that the plaintiff turn over the original notes to the employer, the plaintiff's failure to produce them constituted "purposeful withholding" and, thus, spoliation. *Id.* As a sanction, the district court dismissed the case with prejudice. *Id.*

On appeal, the United States Court of Appeals for the Third Circuit held that the district court "abused its discretion in determining that [the plaintiff] *intentionally* withheld" the original notes from the employer. *Id.* at 79 (emphasis added). The court observed that "[a]lthough a [district court] has discretion to draw inferences from the record on a party's intent, it strays beyond the bounds of its discretion when, as here, there is no factual basis to do so." *Id.* at 74. To the court, the "central problem [was] that the [district court] accepted, without any critical examination, misrepresentations of the record promulgated by [the employer]." *Id.* The employer represented—and the district court accepted—that the employer had "hounded [the plaintiff] for the originals over the course of years" to no avail, yet the record revealed "only two [informal] requests" by the employer "for the original documents in the entire span of [the] case." *Id.* at 74.

The first request was the employer's "pre-litigation" letter to the plaintiff's union representative, with respect to which the court found no basis "to impute the union representative's knowledge of [the employer's] request to [the plaintiff]." *Id.* at 75. The court reasoned that

> had [the employer] intended this letter to result in [the plaintiff] turning over the original notes in question[,] it would have made at least some attempt to pursue their production when [the original notes] did not materialize. Yet, [the employer] never raised the nonproduction of the originals in a motion to compel, or in any other communication.

*Id.*

Similarly, the court found that the employer's second request—an informal email seeking the original notes five days before trial—"fail[ed] to provide support for an

inference that [the plaintiff] knew of [the employer's] request and still . . . intentionally withheld the original notes from them." *Id.*

To the court, the "key issue" was bad faith—*i.e.*, whether the plaintiff's withholding of the original notes was an "*intentional* misrepresentation," as opposed to mere "inadvertence." *Id.* at 76–77 (emphasis added). The court observed:

> In *Brewer* we discussed the connection between a finding of sanctionable spoliation and a ruling on bad faith, stating the following:
>
>> For the [spoliation] rule to apply . . . it must appear that there has been an actual suppression or withholding of the evidence. *No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally* 31A C.J.S. [*Evidence*] § 156(2); 29 [AM. JUR. 2d *Evidence*] § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").
>
> *Brewer*, 72 F.3d at 334 (emphasis added). **Therefore, a finding of bad faith is pivotal to a spoliation determination.** This only makes sense, since spoliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced. **Withholding requires intent.**
>
> As a result, we must be convinced that the [district court], on sufficient evidence, found that [the plaintiff] intended to actually withhold the original documents from [the employer] before we can conclude that sanctionable spoliation occurred.

*Id.* at 79 (italicized emphasis in original, bold emphasis added); *id.* at 79 n.13 ("We note that the verb 'withhold' is defined as 'To keep from doing something, to keep in check or under restraint; to hold back, restrain.' It inherently expresses an intentional act.")

(quoting OXFORD ENGLISH DICTIONARY)). In the absence of evidence that the plaintiff "*actually knew* that [the employer] wanted the original notes," the court found "no basis to characterize [the plaintiff] as one who lied or obfuscated to prevail in her attempt to intentionally withhold the original [notes]." *Id.* at 77 (emphasis added). For these reasons, the court concluded the district court "abused its discretion in determining that [the plaintiff] committed sanctionable spoliation." *Id.* at 79.

To find "actual suppression or withholding" in this case, therefore, the court has the "responsibility" under *Bull* to "plumb the record to learn": (1) whether Emerick, Rustin, or Pofi "actually knew" plaintiff "wanted" the ledgers and internal affairs records at issue during discovery; and (2) whether there are grounds to "characterize" Emerick, Rustin, or Pofi "as [persons] who lied or obfuscated to prevail in [their] attempt to *intentionally* withhold" the ledgers and records from plaintiff in "bad faith." *Id.* at 76–77, 83 (emphasis added). Each requirement will be addressed in turn.

### b.    Actual knowledge

With respect to whether Emerick, Rustin, and Pofi "actually knew" plaintiff "wanted" the grievance ledgers and internal affairs documents at issue, *Bull*, 665 F.3d at 76–77, plaintiff asserts broadly in his Records motion that he "unceasingly strived to enforce discovery requests he initially submitted [to defendants] in 2009." (ECF No. 428 at 1.) After carefully examining the record, however, the court concludes the earliest date on which Emerick, Rustin, and Pofi could have actually known plaintiff sought the grievance ledgers and internal affairs records was April 4, 2011, when plaintiff filed a

document styled as "Exhibit A." *See* (ECF No. 122.) "Exhibit A" is discussed in context below.

As stated previously, plaintiff commenced this action by filing a complaint against defendants on April 7, 2008. (ECF No. 1.) The first discovery-related filing in this case is plaintiff's September 14, 2010, handwritten motion to compel discovery from defendants. *See* (ECF No. 101.) In this motion to compel, plaintiff alleged that on June 24, 2010, he served on defendants—through defendants' attorney, Craig Maravich ("Maravich")—his "first set of interrogatories and [d]ocument requests." (*Id.* at 1 ¶ 1.) Plaintiff professed, however, to have "initially filed these [discovery] materials on December 31, 2009. . . ." (*Id.*) Plaintiff attached a handwritten letter to his motion to compel, dated June 24, 2010, in which he claimed to enclose "interrogatories and document requests directed to all . . . [defendants]." (ECF No. 101-1 at 2.) Plaintiff did not, however, attach to his September 14, 2010, motion to compel the alleged June 24, 2010, or December 31, 2009, discovery requests or other evidence to show he sought inmate grievance ledgers or internal affairs records. *See* (ECF No. 101 at 1–2; ECF No. 101-1 at 1–2.)

On January 31, 2011, defendants responded to plaintiff's motion to compel, stating they "could not find" plaintiff's "purported" June 24, 2010, or December, 31, 2009, discovery requests. (ECF No. 107 at 2.) Defendants stated they would "respond in a timely fashion" if plaintiff "resubmit[ed] his discovery requests." (*Id.* at 2.)

On February 3, 2011, a magistrate judge issued an order denying plaintiff's motion to compel without prejudice. (ECF No. 108 at 2.) In the order, the magistrate judge stated that Maravich's "response" to plaintiff's motion to compel was, "to say the least,

inadequate." (*Id.* at 1 n.1.) The magistrate judge, nonetheless, denied plaintiff's motion to compel, reasoning that

> [b]y not providing this court with copies of the interrogatories and discovery requests at issue [in his motion to compel], [p]laintiff fails to meet his burden of demonstrating the relevancy of his requests. Consequently, [plaintiff's motion to compel] will be denied without prejudice to [p]laintiff refiling it with the requests attached.

(*Id.* at 2.) On February 24, 2011, this court found the magistrate judge's ruling on plaintiff's motion to compel neither clearly erroneous nor contrary to law, pursuant to Federal Rule of Civil Procedure 72. (ECF No. 115.)

On March 4, 2011—in response to the magistrate judge's February 18, 2011, order to show cause why defendants should not be sanctioned for failing to respond to plaintiff's first motion to compel (ECF No. 114 at 1–2)—Maravich argued plaintiff

> has everyone chasing discovery ghosts. The court does not have [plaintiff's alleged June 24, 2010, or December 31, 2009, discovery requests. *See* (ECF No. 108.)] Counsel for the [since-terminated] medical defendants does not have them. [*See* (ECF No. 112.)] Undersigned counsel has offered for [p]laintiff to resubmit discovery requests and that [d]efendants will make all efforts to respond in a timely fashion. [*See* (ECF No. 107.)] To date, plaintiff has not done so.

(ECF No. 116 at 7.) On April 13, 2011, the magistrate judge issued an order stating, "[b]ased on . . . Maravich's responses [to the court's motion to show cause], this [c]ourt will exercise its discretion not to impose sanctions at this time." (ECF No. 123 at 3.)

The record in this case, therefore, belies plaintiff's statement in his Records motion that he "unceasingly strived to enforce discovery requests he initially submitted [to defendants] in 2009." (ECF No. 428 at 1.) There is nothing in the record from which the court can reasonably infer Emerick, Rustin, or Pofi "actually knew" about plaintiff's

request for inmate grievance ledgers and records prior to his filing of "Exhibit A" on March 4, 2011. *See Bull*, 665 F.3d at 73.

On March 4, 2011, plaintiff filed with the court a handwritten document styled as "Exhibit A." (ECF No. 122.) In this filing, plaintiff included handwritten discovery requests dated "6/23/~~2009~~ 2010"—*i.e.*, plaintiff struck through "2009" by hand with pen and wrote "2010." *See* (*id.* at 5, 10, 16, 25.) In these handwritten discovery requests, plaintiff sought documents from all defendants relating to: (1) "the personnel/disciplinary records of . . . [defendants], including complaints lodged against them which may be held in some other record"; and (2) "[e]ach complaint [plaintiff] ever filed at [the] ACJ, either formal or informal." (*Id.* at 3 ¶ 10, 4 ¶ 11.) Plaintiff asked Rustin to answer the following interrogatories: (1) "[i]dentify and describe all policies, memoranda, or procedures for prisoners at [the ACJ] to file administrative grievances against prison guards"; and (2) "[i]dentify and describe any document, statistical compilation, or other report showing the type, amount[,] and disposition of grievances filed by ACJ prisoners from 1995 through 2008." (*Id.* at 6 ¶ 1, 7 ¶ 5.) Plaintiff asked Emerick to answer the following interrogatory: "[i]dentify and describe all occasions where complaints of any sort of mistreatment by [ACJ] staff were made by [plaintiff] or in behalf of [plaintiff] and, if any, list the actions taken in response for each occasion." (*Id.* at 14 ¶ 2.) Finally, plaintiff asked Pofi to answer the following interrogatory: "[i]dentify and describe any and all complaints you are aware of [plaintiff] making (or complaints made in his behalf) concerning problems he had with any ACJ guard between 2005–2008 and note any remedial action you took in response." (*Id.* at 25 ¶ 20.)

After "plumb[ing]" each and every filing of this case's voluminous record,[7] *Bull*, 665 F.3d at 83, the court concludes plaintiff proved by a preponderance of the evidence that the first date on which Emerick, Rustin, and Pofi "actually knew" plaintiff "wanted" inmate grievance ledgers and documents was March 4, 2011, the date on which he filed "Exhibit A" with the court. *Id.* at 76–77; *see* (ECF No. 122.) While plaintiff did not expressly request grievance ledgers and internal affairs documents[8] in "Exhibit A," his requests were focused and individualized enough to put Emerick, Rustin, and Pofi on notice that he sought ACJ inmate grievance records, which reasonably encompass the ledgers and internal affairs documents at issue in this case. This satisfies Bull's "actual knowledge" requirement.[9] *See Bull*, 665 F.3d at 76–77.

---

[7] As of the date of this memorandum opinion, the docket in this case has 452 entries.

[8] On July 21, 2014, plaintiff filed a subsequent motion to compel discovery, in which he alleged expressly for the first time—on the record, at least—that "[the] ACJ maintains a ledger of prior grievances filed by prisoners." (ECF No. 379 at 4.) On September 11, 2014, the court held a status conference at which plaintiff stated:

> I got [information about grievance ledgers being maintained by the ACJ] from [defendants' counsel] himself. He produced an exhibit at one of the depositions, and that exhibit was later provided to me when I ordered the deposition transcript of the grievance policy that was supposedly in effect in 1996, and [defendant's counsel] questioned . . . [Thomas] Leight about that policy. And in that policy it states that a ledger will be maintained of the grievances . . . and . . . [Thomas] Leight stated that there [were ledgers maintained].

(ECF No. 388 at 8–9.)

[9] It is *possible* Emerick, Rustin, and Pofi received plaintiff's discovery requests prior to March 4, 2011, as plaintiff alleges in his Records motion and throughout the record in this case. Plaintiff, however, bears the burden of proving spoliation by a preponderance of the evidence. *Universal Underwriters Ins. Co.*, 2014 WL 7335668, at *4. Given

### c.    **Intentional withholding in bad faith**

After "plumb[ing]" the record in this case, the court concludes there are no grounds upon which to "characterize" Emerick, Rustin, or Pofi "as [persons] who lied or obfuscated to prevail in [their] attempt to *intentionally* withhold" materials from plaintiff after learning about his requests through "Exhibit A," as required to show bad faith spoliation. *Bull*, 665 F.3d at 77, 83 (emphasis added). As stated previously, the Third Circuit Court of Appeals held in *Bull* that "a finding of bad faith is *pivotal* to a spoliation determination." *Id.* at 79 (emphasis added). Plaintiff failed to meet his burden of adducing evidence from which the court can reasonably infer "fraud and a desire to suppress the truth" on the part of Emerick, Rustin, or Pofi. *Brewer*, 72 F.3d at 334 (bad faith "arises . . . only when the spoliation . . . was intentional[] and indicates fraud and a desire to suppress the truth" (quoting 29 AM. JUR. 2d *Evidence* § 177)). In light of plaintiff's "failure to produce any evidence of [his] own" beyond bare allegations that Emerick, Rustin, or Pofi acted in bad faith, the record in this case "supports abiding by a presumption of inadvertence"—not intentional withholding in bad faith. *Bull*, 665 F.3d at 77. For these reasons, plaintiff's Records motion will be denied.

In particular, plaintiff failed to prove by a preponderance of the evidence that Emerick or Rustin intentionally withheld the ACJ grievance ledgers in bad faith after

---

plaintiff's failure to attach his alleged June 24, 2010, or December 31, 2009, discovery requests to any filing prior to "Exhibit A," plaintiff failed to adduce evidence from which the court can reasonably conclude Emerick, Rustin, or Pofi "actually knew" about plaintiff's requests for inmate grievance materials before he filed "Exhibit A" on March 4, 2011. *See Bull*, 665 F.3d at 76–77.

learning of plaintiff's request for them on March 4, 2011—*i.e.*, the date on which plaintiff filed "Exhibit A" with the court. At the October 8, 2014, evidentiary hearing, Emerick admitted—in response to cross-examination by plaintiff—that after searching for ACJ grievance ledgers from the relevant timeframe, none were located and "[t]hey must have been mistakenly lost." (ECF No. 394 at 27:23–25, 28:1.) Nothing in the record discusses the alleged "loss" of the grievance ledgers further. Because the record shows only inadvertence on Emerick's and Rustin's part and is devoid of proof that Emerick or Rustin intentionally withheld the ledgers in bad faith after learning of plaintiff's requests for them through "Exhibit A" on March 4, 2011, plaintiff failed to meet his burden of adducing evidence from which the court can reasonably infer "fraud and a desire to suppress the truth" about the ledgers on the part of Emerick or Rustin. *Brewer*, 72 F.3d at 334 (quoting 29 Am. Jur. 2d *Evidence* § 177).

Similarly, plaintiff failed to prove by a preponderance of the evidence that Pofi intentionally withheld the ACJ internal affairs records in bad faith after learning about plaintiff's request for them through "Exhibit A" on March 4, 2011. Plaintiff cross-examined Pofi with respect to the internal affairs records at the October 8, 2014, evidentiary hearing in the following manner:

> Q:   . . . [W]hen the [ACJ] internal affairs department does an investigation and files are created as part of this investigation, the internal affairs department maintains those reports; correct?
>
> A:   That's correct.
>
> Q:   Okay. And these records may include complaints made by inmates against staff members of [the ACJ]?

A:      Maybe.

. . .

Q:      . . . [C]ould these records include claims made by inmates of staff using excessive force against them?

A:      [They] may.

. . .

Q:      Okay. Were you ever instructed by anyone to look into the investigative files pertaining to complaints made by inmates against staff at [the ACJ]?

A:      No.

(ECF No. 394 at 48:5–21, 49: 5–8.) During his May 28, 2014, deposition, Pofi stated he worked in the ACJ's internal affairs department "from 2001 until 2011," after which he retired from the ACJ. (ECF No. 379-7 at 5:13; ECF No. 394 at 46.) In light of this testimony, the record is unclear with respect to whether Pofi worked in the ACJ's internal affairs department when plaintiff requested the records through "Exhibit A" on March 4, 2011. Without any evidence to show Pofi worked in internal affairs when plaintiff requested internal affairs records, the court cannot conclude Pofi withheld these materials from plaintiff intentionally in bad faith, as required to prove spoliation. *Bull*, 665 F.3d at 77, 83 (requiring evidence that the offending party "lied or obfuscated to prevail in [an] attempt to intentionally withhold" materials from the requesting party). Plaintiff made conclusory statements about Pofi but failed to adduce evidence of bad faith.

While plaintiff and the court, *see* (ECF No. 394 at 82:13–19), criticized the ACJ's document retention policies and defendants' failure to explain how and why "[n]othing

exists . . . [anymore]," *see* (ECF No. 418 at 6:25), the burden remains on plaintiff to prove by a preponderance of the evidence that Emerick, Rustin, and Pofi *intentionally* withheld the ledgers and documents at issue in bad faith. *Bull*, 665 F.3d at 79 ("Withholding requires intent."). Plaintiff proved inadvertent or negligent destruction or loss of the ACJ ledgers and records and pitiable document retention capabilities and protocols on the ACJ's part. Under *Bull* and *Brewer*, however, "[n]o unfavorable inference" of bad faith "arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed" or where "destruction was a matter of routine with no fraudulent intent." *Bull*, 665 F.3d at 79 (quoting *Brewer*, 72 F.3d at 334). There is no evidence in the record from which the court can reasonably conclude Emerick, Rustin, or Pofi *intentionally* withheld or suppressed the ACJ grievance ledgers and documents from plaintiff in bad faith.[10] For this reason, plaintiff failed to show spoliation of the ACJ ledgers and internal affairs documents.

Because the court concludes there is insufficient evidence to prove by a preponderance of the evidence that Emerick, Rustin, and Pofi acted in bad faith to

---

[10] Under *Bull* and *Brewer*, plaintiff is incorrect that "[n]egligence satisfies a culpable state of mind for purposes of a spoliation inference." *See* (ECF No. 428 at 12 (citing decisions from the United States District Court for the Southern District of New York).) In *Bull*, the Third Circuit Court of Appeals held explicitly that "a finding of bad faith is *pivotal* to a spoliation determination," *Bull*, 665 F.3d at 77 (emphasis added), and "[w]itholding" of evidence "*requires* intent"—not mere negligence or inadvertence. *Id.* at 79 (emphasis added). That plaintiff was apparently forced to "improvise[] by using [Southern District of] New York case law . . . due to an error in the computer," *see* (ECF No. 425 at 5), is of no consequence to this court, which is bound by precedent from the United States Supreme Court and Third Circuit Court of Appeals—not from the Second Circuit Court of Appeals.

intentionally withhold the ACJ grievance ledgers and records from plaintiff, the court need not address the final *Brewer* factor—*i.e.*, whether Emerick, Rustin, or Pofi had a reasonably foreseeable duty to preserve the records at issue, *Bull*, 665 F.3d at 73—and the court need not address the appropriate spoliation sanction to impose.

For these reasons, plaintiff's Records motion will be denied.[11]

## 2.     **The Video motion**

### A.     **Factual background**

Plaintiff contends in his Video motion that certain of defendants "quite possibly destroyed . . . intentionally" a September 21, 2006, video allegedly captured by the ACJ's surveillance system depicting defendant Lt. ACJ Louis Leon ("Leon") "brutally beating" and "slapping" plaintiff "on his bare buttocks" in the ACJ's cellblock common area. (ECF No. 425 at 1, 3.) Plaintiff alleges "[a]ll of the footage from [the] morning [of September 21, 2006,] was . . . destroyed by defendants—after they reviewed it." (ECF No. 426 at 2.) Plaintiff alleges defendants—and, in particular, Pofi and Emerick— "personally deleted the video recording . . . or allowed [it] to be deleted" notwithstanding their duty to preserve it under ACJ policy and in light of plaintiff's reasonably foreseeable claims against them. (*Id.*)

---

[11] Should this case proceed to trial and to the extent plaintiff demonstrates relevancy to the remaining claims, plaintiff will be permitted to put on evidence that he sought the ACJ grievance ledgers and internal affairs records at issue and that Emerick, Rustin, and Pofi were unable to provide these materials to him. Because plaintiff failed to prove spoliation, however, sanctions such as an adverse inference instruction from the court are not warranted.

The court will set forth the background information relevant to plaintiff's Video motion in the following order: (i) plaintiff's factual account of the September 21, 2006, incident; (ii) countervailing factual accounts of the September 21, 2006, incident; and (iii) materials relating to the ACJ's video surveillance system.

### i.    Plaintiff's account of the September 21, 2006, incident

Plaintiff alleges that on September 21, 2006, defendants Bozak, Kavals, and McCall

> proceeded to [p]laintiff's cell [where he was incarcerated at the ACJ] and ordered him to submit to a cell search. Plaintiff was strip searched, removed from the cell[,] and placed inside of the empty exercise pen under constant watch while defendants "searched" [p]laintiff's cell. Approximately an hour later, defendants Kavals, McCall, and Bozak removed [p]laintiff from the exercise pen and escorted him back to [his] cell. Defendant McCall instructed . . . Kavals to "pat search" [p]laintiff, "[and Kavals] took this opportunity to run his hands about . . . [plaintiff's] body and private area." When this failed to provoke a response that would justify defendants using force against [p]laintiff, defendants announced that [p]laintiff must submit to another strip search, which [p]laintiff complied with.
>
> In the course of the second strip search[,] defendant McCall made a sexually explicit comment praising the length of [p]laintiff's phallus and excitedly left the cell, soon after returning with defendant Leon. Defendant Leon instructed [p]laintiff to do yet another strip search from start to finish. Plaintiff complied again, up until the final part when defendant Leon pulled out a flashlight and claimed he wanted to check *inside* of [p]laintiff's rectum because he believed [p]laintiff had unspecified contraband. At this point[,] [p]laintiff refused and was immediately attacked by defendants slamming [p]laintiff on the metal bed frame, choking [p]laintiff, threatening [p]laintiff with death[,] and punching [p]laintiff. Defendant Leon had [p]laintiff pinned down with his full body weight . . . while defendant Bozak violently twisted [p]laintiff's already injured right leg yelling, "turn over, turn over."
>
> Defendants eventually slammed [p]laintiff on the floor and handcuffed him. Defendants Leon and McCall then began punching and kicking [p]laintiff while the other two defendants held [p]laintiff vulnerable for the purpose.

Plaintiff was yanked up by the cuffs and slammed against the wall outside of his cell, at which point defendant Leon slapped [p]laintiff on his bare buttocks and stated, "You're my new bitch[."] Defendant Leon then used a combination of twisting [p]laintiff's arm, kicking him like a dog, yanking the cuffs[,] and punching [p]laintiff to force [p]laintiff across the dayroom area to the "sally port" in anticipation of [p]laintiff receiving medical treatment. By this time [p]laintiff was badly bruised and bloody.[12]

(ECF No. 426 at 4–5.)

Supporting plaintiff's account of the alleged assault is a September 22, 2006, letter from plaintiff's counsel, Assistant Federal Public Defender Jay Finkelstein ("Finkelstein"), to Rustin. (ECF No. 429-7.) In the letter, Finkelstein wrote that after meeting with plaintiff, it was "quite apparent" plaintiff was "in immediate need of medical attention" for his "severely swollen right cheek, a deep wound on his forehead, [and] various open wounds and cuts on his face." (*Id.* at 2.) Finkelstein wrote that ACJ nurses informed plaintiff he "needed stiches on his forehead" but "this was not done," and plaintiff "fashioned his own crude attempt of making a bandage." (*Id.*)

Loosely supporting plaintiff's account of the incident is the January 30, 2013, written deposition[13] of Derrick Hampton ("Hampton"). (ECF No. 429-17 at 43.) A fellow inmate at ACJ, Hampton met plaintiff in "September [2006]." (*Id.* at 44.) In question twelve of Hampton's written deposition, plaintiff asked:

---

[12] To support his account of the alleged assault occurring at the ACJ on September 21, 2006, plaintiff cites and quotes his amended complaint. *See* (ECF No. 426 at 4–5 (quoting (ECF No. 55)).)

[13] Plaintiff took written depositions of ACJ inmates pursuant to Federal Rule of Civil Procedure 31.

> [Plaintiff] claims that on September 21, 2006, [ACJ] guards [Leon], Bozak, Kavals, and . . . McCall assaulted [plaintiff] inside his cell and took him from the DHU while he was naked as . . . Leon continued to assault [plaintiff]. Set forth your knowledge of the facts surrounding this incident, if any, and explain how you know these facts.

(*Id.* at 48.) In response to question twelve, Hampton wrote: "Again witnessed Leon, McCall [and] Bozak. Don't know the other (Kavals). Seen the officers dragging [plaintiff] across the floor. He was certainly struck by . . . Leon but all was involved in dragging [plaintiff].[14] (*Id.*)

### ii. Countervailing accounts of the incident

### a. Leon deposition

Plaintiff included as an exhibit to his Video motion a short excerpt[15] from his May 21, 2014, deposition of Leon, a correctional officer at the ACJ in September 2006. (ECF No. 429-1.) With respect to the September 21, 2006, incident, plaintiff and Leon engaged in the following exchange:

---

[14] Plaintiff deposed five other ACJ inmates. *See* (ECF No. 429-17.) Plaintiff asked all five ACJ inmates the same question twelve he asked Hampton, to which they responded:

- "N/A" (*id.* at 7 (Carrington Keys deposition));

- "I was removed from the DHU by this time, so I have no knowledge of this incident either" (*id.* at 27 (Joseph Nixon deposition));

- "I have witnessed . . . Leon beat inmates almost to death[;] I'll support that claim also" (*id.* at 68 (Robert W. Dixon deposition));

- "N/A" (*id.* at 88 (Leslie Mollet deposition)); and

- Gilbert L. Fowler left question twelve blank. (*Id.* at 108.)

[15] The full deposition of Leon is docketed at (ECF No. 377-3.)

Q:    What do you remember about [the September 21, 2006, incident]?

A:    I remember it was [a] very brief encounter.

Q:    That's all you remember?

A:    I recall entering the cell because you were refusing to comply with strip searching. I conducted a strip search on you, and upon completion, you took a swing at me.

Q:    So the strip search was over?

A:    You failed to comply with the strip search instructions given by . . . McCall. One of the officers, I don't know who it was, came and got me out of the office. I entered the cell. . . . When I entered the cell, . . . McCall exited the cell, leaving Kavals and I [*sic*] in there alone with you. You stood in the middle of the cell naked. I went ahead and gave you the instruction to complete the strip search, which you reluctantly complied with, and upon completion you took a swing at me.

      When you took a swing at me, . . . Kavals grabbed you[;] you were taken to the floor, secured in the handcuffs behind your back. I don't know which one of use put the handcuffs on you, but when you were controlled in cuffs, we left the cell, opened the food slot, removed the cuffs, and that was the extent of our encounter during your whole stay at [the ACJ].

. . .

Q:    And what force was used?

. . .

A:    . . . Kavals grabbed you, preventing you from striking me in the face, and just took you to the ground. That was it.

Q:    There were no punches?

A:    There was [*sic*] no punches, no kicking, no scratching, no nothing. You were simply controlled to the ground, placed into cuffs, and that was the extent of the force. We exited the cell and removed the cuffs through the slot.

Q:     And you put me back in the cell?

A:     You were never out of the cell. The strip search was conducted in the cell when the force occurred, and you were left in the cell and unsecured in the cell.

Q:     So I never left the cell?

A:     You never left the cell in my presence.

Q:     So you don't recall me being taken to medical?

A:     Nope. If I can refer to my reports, I may recollect it, but I don't recall that. I don't believe you had any injuries on you at all, but—

Q:     I didn't have any injuries?

A:     —that was ten years ago, though.

Q:     But you don't recall me having any injuries?

A:     Nope.

(*Id.* at 4:23–25, 5:1–25, 6:1–13.)

### b.     <u>Gasser deposition</u>

Plaintiff included as an exhibit to his Video motion excerpts from his August 6, 2014, deposition of Kimberly Gasser ("Gasser"), the director of nursing at the ACJ in September 2006. (ECF No. 429-3.) With respect to the September 21, 2006, incident, plaintiff and Gasser discussed a September 21, 2006, medical "progress note," in which Gasser wrote, "Brought [plaintiff] to [the ACJ] infirmary for small forehead laceration. Cleaned with NSS, dried and sterile strips applied. Skin well approximated." (*Id.* at 13:20–25, 14:1–2.) Gasser testified that her annotation, "[s]kin well approximated," signified plaintiff's forehead wound "was closed easily," after which Gasser "sent

[plaintiff] on [his] way." (*Id.* at 16:25, 17:1–4.) Gasser testified that based upon her notation, plaintiff's forehead wound "was a small laceration . . . cleaned with normal saline, and steri[le] strips were applied." (*Id.* at 21:2–4.) With the exception of the progress note, Gasser testified she "[did not] recall [the] specific incident" leading up to plaintiff's need for medical care on September 21, 2006. (*Id.* at 14:16–18.)

### ii.    Materials relating to the ACJ's video surveillance system

### a.    The ACJ's use of force video policy

Plaintiff included as an exhibit to his Video motion the Allegheny County Bureau of Corrections' January 4, 2006, "Administrative Directive #1" (the "ACJ force directive"), which set forth the ACJ's policy with respect to the "use of force and the justification of its use" against inmates. (ECF No. 429-2 at 1.) The ACJ force directive provides, in relevant part, that "[i]t is the policy of [the ACJ]":

1.    That use of force is authorized to prevent escapes, to prevent death or injury to staff, inmates[,] and others, to protect property, and to enforce the rules and regulations of [the ACJ]; . . .

4.    To report, document[,] and review all incidents of use of force, and to videotape *planned* uses of force. . . .

(*Id.* at 1 (emphasis added).)

The ACJ force directive provides that a "*planned* use of force activity ([*e.g.*], cell extraction, use of oleoresin capsicum aerosol) shall be supervised by a staff member, who shall: . . ."

C.    Ensure the videotaping of incidents where a use of force can be reasonably expected;

D. Monitor and direct the video recording equipment to ensure complete coverage of the incident . . . to the conclusion of the incident; [and]

E. Initiate post incident medical reporting and documentation procedures.

(*Id.* at 3 (emphasis added).)

The ACJ force directive required ACJ staff to submit to the ACJ "Shift Commander" "[w]ritten reports . . . from the person who applied the force and from all who witnessed or were involved in the incident" no later than the "end of the employee's tour of duty." (*Id.* at 4.) The Shift Commander was required to "coordinat[e] the package of reports on the [use of force] incident" and submit it to the ACJ warden's office. (*Id.*) The package was to include "[v]ideotape and/or photographs," if any existed, related to a use of force or "a written explanation detailing the reason the video camera was not used" for "an incident [of] force [that was] not videotaped."[16] (*Id.*)

---

[16] There is no evidence in the record demonstrating that the ACJ adhered to the ACJ force directive. Consequently, the court will not consider the ACJ force directive for purposes of plaintiff's Video motion under Federal Rule of Evidence 104(b). *See supra* note 5 (declining to consider the 2005 grievance directive for the same reason). In any event, the ACJ force directive requires videotaping only for *planned* uses of force—*e.g.*, cell extractions or uses of oleoresin capsicum aerosol. Plaintiff does not allege the September 21, 2006, incident was planned in either his Video motion or amended complaint.

### b. Pofi deposition

Plaintiff included as an exhibit to his Video motion a short excerpt[17] from his May 28, 2014, deposition of Pofi, an ACJ internal affairs employee. (ECF No. 429-4.) In the excerpt, plaintiff and Pofi engaged in the following exchange:

Q:     . . . [W]hen you have an incident where criminal charges aren't brought, who is responsible for preserving the video evidence?

A:     Who preserves the video, if there is one?

Q:     Yes

A:     Internal affairs keeps it, and the deputy warden has a copy of it, too.

Q:     So the procedure for investigations, are those procedures in writing?

A:     No, there's no set procedure in writing, that I know about anyways.

Q:     So how do people know what steps to take with regard to the preservation of evidence, video?

A:     Any use of force is reviewed by internal affairs and . . . Emerick. Every day, every other day, whenever they get a chance, they review every video of the use of force, and the copies are kept in . . . Emerick's office.

Q:     Copies are kept of the actual video, is that what you said?

A:     There's a video and the reports are all—there's a file made, the reports and the video are all put together.

Q:     And suppose you review a video and don't see anything at all of substance, is a report still written? . . . Do you still write the report?

. . .

A:     Yes—well, we don't write. The officer of where it happened makes a report, but there's a report kept, it's not thrown away.

---

[17] The full deposition of Pofi is docketed at (ECF No. 379-7.)

Q:      And the report would say, like, okay, as part of this investigation, I reviewed the video and it didn't contain or show anything to support the allegation?

A:      It's very simple. There's a form that gets gone over, excessive force form, that comes through ACA, and on that report it would say whether . . . Emerick, myself, or at the time the county police if they review it, they put down whether they think it was a use of force or not, a legitimate use of force.

Q:      Based on the video.

A:      Yes.

(ECF No. 379-7 at 9:8–25, 10:1–25, 11:1–8.)

### c.      Leight deposition

Plaintiff included as an exhibit to his Video motion a short excerpt[18] from his May 20, 2014, deposition of Thomas Leight ("Leight"), an ACJ internal affairs employee and a nonparty. (ECF No. 429-5.) When plaintiff asked Leight about whether ACJ staff preserved video of excessive force incidents, Leight stated, in relevant part:

As long as there was video . . . present. I mean, if it wasn't captured on video . . . it wouldn't have been [preserved]. . . . [A]s you're aware, you were in [the ACJ], you know there [were] cameras placed . . . on the housing units, there were some fixed cameras, and I believe—I don't know how many movable cameras. If the movable camera didn't capture—if there was nobody [sic] able to—you know, at a control to control that movable camera at the time of the incident to be able to zoom in on a particular incident[,] . . . it wasn't captured. Now, the fixed cameras might have captured some stuff, but there [were] a lot of blind spots in those fixed cameras. . . . [M]ost of the time[,] [the movable cameras were] set on the corrections officer sitting at his desk there. . . . [I]f there's no code called, nobody's going to be sitting there watching the camera. . . . I don't know how many cameras are in [the ACJ], but there's [sic] a lot of them. Nobody's just sitting there watching the cameras. . . . [I]f the fixed camera does not show the incident and the movable camera doesn't because [no

_____
[18] The full deposition of Thomas Leight is docketed at (ECF No. 379-4.)

one] watches it, you can't go back and move that camera after the incident's over.

(ECF No. 379-4 at 24:12–25, 25:1–8, 25:16–18; 27:3–8, 27:16–21.) During the deposition, defendants' counsel asked Leight, "[D]o you recall viewing any videotape involving [plaintiff]?" (*Id.* at 50:15–16.) Leight responded, "I don't." (*Id.* at 50:17.)

### d.     <u>Pastor deposition</u>

Plaintiff included as an exhibit to his Video motion a short excerpt from his September 11, 2014, deposition of Samuel Pastor ("Pastor"), an ACJ internal affairs employee and a nonparty. (ECF No. 429-6.) In the excerpt, plaintiff and Pastor engaged in the following exchange:

> Q:    Just based on your recollection, in the month September of 2006, do you know for sure whether the cameras were active [at the ACJ]?
>
> A:    The cameras were there.
>
> Q:    And were they functional; do you know?
>
> A:    To my belief, they were functional.
>
> Q:    When a physical altercation occurs in an area of [the ACJ] where you know there are cameras, whose responsibility is it to review the footage?
>
> A:    Are you talking about in 2006 or present day?
>
> Q:    Well okay. Pardon me. In 2006.
>
> A:    That I cannot answer. I can answer for right—present, today.
>
> Q:    Is the type of process different than it would have been in 2006?
>
> A:    . . . Emerick was the deputy warden back in 2006. So   I'm sure that he would have had some sort of hand in reviewing all   uses of force, even at that time.

. . . [19]

Q:      And do you know—to your knowledge, did that review include a review of the video footage?

A:      Yes. It always did, ever since the cameras existed.

. . .

Q:      Are there any known instances of video footage that is part of a use of force investigation coming up missing? . . .

A:      Coming up missing?

Q:      Yes.

A:      There have been times that our office may have received a complaint that there was an assault somewhere, and the footage only stays on a hard drive for a certain amount of time. So if we wouldn't have gotten that complaint in the time that the video was preserved to the hard drive, we would not have been able to preserve it to disk.

(*Id.* at 3:4–25, 4:2–6, 5:10–25.)

## B.    Whether defendants spoiled the September 21, 2006, video

As stated previously, plaintiff claims certain of defendants "quite possibly destroyed . . . intentionally" the alleged September 21, 2006, video of Leon "brutally beating" and "slapping" plaintiff "on his bare buttocks" in ACJ's cellblock common area. (ECF No. 425 at 1, 3.) Plaintiff alleges that "[w]hile there was no footage of what occurred inside of [p]laintiff's cell, defendants' six ceiling-mounted digital surveillance camera[] system did capture" the alleged assault taking place in the common area. (ECF No. 426 at 1–2.)

---

[19] In his Video motion, plaintiff omits from his exhibits pages eight and nine of the Pastor deposition, jumping from page seven to ten in the deposition transcript.

Defendants argue plaintiff "offered no evidence that the video footage he is seeking ever existed." (ECF No. 441 at 2 ¶ 8.)

The court agrees with defendants that the record lacks sufficient evidence from which the court can conclude a video was ever made of the incident in question. The parties dispute where in the ACJ the alleged September 21, 2006, incident took place. Plaintiff argues the altercation took place outside his cell, where the cameras were allegedly active. Defendant Leon alleges the altercation took place inside plaintiff's cell, where the parties agree the cameras were not active. These competing factual accounts each draw support from the record. Given this dispute of fact with respect to where the alleged incident took place, plaintiff must rebut defendants' assertions and show by a preponderance of the evidence that defendants filmed and recorded the alleged altercation. Plaintiff fails to make this showing. Nothing in the record demonstrates sufficiently that ACJ cameras captured and preserved for subsequent review footage of the alleged incident.

To prove a party in bad faith and in advance of reasonably foreseeable litigation suppressed or withheld tangible evidence over which it once exercised control, *Bull*, 665 F.3d at 73, the moving party must first satisfy the court that the tangible evidence at issue *existed* at some point prior to its alleged spoliation. The court cannot "compel or punish the failure to produce things that do not exist. . . ." *Bracey v. Harlow*, Civ. A. No. 11-04, 2012 WL 6629592, at *2 (W.D. Pa. Dec. 19, 2012); *Hammonds v. Walsh*, Civ. A. No. 11-1666, 2014 WL 2604706, at *4 (M.D. Pa. June 10, 2014) ("Given the plaintiff has failed to demonstrate the evidence ever existed, . . . it could not be suppressed or withheld."); *cf.*

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("[A] party is not obliged to produce, at the risk of sanctions, [evidence] that it does not possess or cannot obtain.").

The requirement that plaintiff prove the existence of allegedly spoiled evidence fits squarely within the spoliation analysis set forth in *Bull* and *Brewer*. In *Bull*, it was undisputed that the tangible evidence at issue—an original doctor's note—existed and was withheld in advance of litigation. *Bull*, 665 F.3d at 70–72, 74. In *Brewer*, it was undisputed that the tangible evidence at issue—a personnel file—once existed in the possession of the defendant's in-house counsel until his death when it was lost. *Brewer*, 72 F.3d at 334. In *Brewer* and *Bull*, the United States Court of Appeals for the Third Circuit required a showing that the offending party had, at some point, exercised "control" over the tangible evidence allegedly spoiled. *Id.*; *Bull*, 665 F.3d at 73. In the spoliation context, therefore, "control" necessitates a reasonable showing that the offending party exercised power over an article of evidence that *existed* prior to its intentional withholding or suppression. *See Hammonds*, 2014 WL 2604706, at *1 ("[The plaintiff] has not supplied any evidence that [videos of the alleged prison assault] existed or were in the care, custody, or control of the individual defendants."); *United States v. Nelson*, 481 F. App'x 40, 41–42 (3d Cir. 2012) (applying *Bull* where a prison official with personal knowledge testified that "one fixed video camera" in the prison "would have provided a[] reasonable view of [the inmate's] cell door" and "[n]either party dispute[d] that the evidence in question—the video tape from the stationary camera with a view of [the inmate's cell] door—was within the control of the government"); *cf.*

*McCann v. Kennedy Univ. Hosp., Inc.*, Civ. A. No. 12-1535, 2014 WL 282693, at *5 (D.N.J. Jan. 24, 2014) (applying *Bull* where "neither party contest[ed] the fact that [the hospital] was in possession and control of the emergency room [lobby] videotapes at the time they were taped over. . . .").

After carefully evaluating each of plaintiff's contentions and the exhibits accompanying his Video motion, the court concludes plaintiff failed to adduce evidence from which the court can reasonably conclude the September 21, 2006, video ever existed in defendants' control. *See Hammonds*, 2014 WL 2604706, at *1, *4. As stated, the record shows there are two conflicting versions of where in the ACJ the incident in issue took place—*i.e.*, plaintiff's version that it occurred outside his cell in the ACJ's common area and defendants' version that it occurred inside plaintiff's cell. It is clear that if the incident occurred inside plaintiff's cell, no video would have been taken. The evidence is sufficiently conflicting that the court must conclude plaintiff failed to prove by a preponderance of the evidence that any of the individual defendants controlled a functioning video surveillance system at the ACJ on September 21, 2006, that both: (1) filmed and recorded the specific area of the ACJ in which the alleged assault took place, at the specific time alleged; and (2) preserved any resulting footage in an accessible medium for defendants' subsequent review (and bad faith intentional withholding).[20] *Cf.*

---

[20] The court notes that *any* ACJ video once in existence depicting the specific area of the ACJ in which the alleged assault occurred, at or around the time plaintiff alleges it occurred, would be "relevant" to plaintiff's claims for deprivation of his constitutional rights, as required by *Bull*. Federal Rule of Evidence 401 provides that evidence is "relevant" if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." A video depicting the "brutal beating" alleged by

*Williams v. Klem*, Civ. A. No. 07-1044, 2010 WL 3812350, at *3 (M.D. Pa. Sept. 22, 2010) ("[The inmate's] spoliation sanction motion . . . present[s] countervailing factual accounts [that] cannot be readily reconciled. . . . These competing views each draw support from the record . . . and in the final analysis may turn on the credibility of various witnesses. Since these matters are fact-bound and inextricably tied to witness credibility determinations, they are not well-suited to the type of pre-trial ruling [issuing sanctions]

plaintiff would tend to make more probable the facts essential to plaintiff's excessive force claims, while a video depicting anything other than a "brutal beating" would tend to make those facts less probable. In this case, however, plaintiff failed to prove by a preponderance of the evidence that a September 21, 2006, video existed—its purported substance notwithstanding. *Cf. Nelson*, 481 F. App'x at 41–42.

There was no evidence presented about the ACJ's layout and the approximate positioning of surveillance cameras in September 2006, beyond vague allusions to the ACJ's "exercise pen," "Disciplinary Housing Unit," "dayroom area," "cellblock common area," "sally port," and "ceiling-mounted" cameras. Without specific—or even approximate—contextual information concerning the ACJ's layout and the location of cameras in relation to the alleged altercation, the court cannot determine with any specificity where in the ACJ plaintiff alleges the incident in issue took place, let alone whether an ACJ camera filmed and recorded that particular area on the specific date and time in question. For example, plaintiff alleges the "surveillance camera[s] stationed in the [Disciplinary Housing Unit] where the September 21, [20]06 altercation occurred 'definitely show[] the dayroom area.'" (ECF No. 425 at 3 ¶ 16.) This statement, however, conveys nothing of substance without specific or approximate supporting information with which the court can orient itself contextually and conceptually within the ACJ, as it stood in September 2006. The parties, moreover, genuinely dispute where in the ACJ the alleged altercation took place.

The omission of even approximate information with respect to the ACJ's layout and surveillance camera positioning renders it impossible for the court to determine with any degree of certainty whether the ACJ's cameras reasonably could have recorded the September 21, 2006, incident as reported by plaintiff. *Cf. Nelson*, 481 F. App'x at 41–42 (applying *Bull* where a prison official with personal knowledge testified that "one fixed video camera" in the prison "would have provided a[] reasonable view of [the inmate's] cell door" and "[n]either party dispute[d] that the evidence in question—the video tape from the stationary camera with a view of [the inmate's cell] door—was within the control of the government"). In the absence of such evidence, plaintiff's Video motion must be dismissed.

[that the inmate] seeks from the [c]ourt[,] [particularly because the inmate] bears the burden of proof. . . ." (citing *Byrnie v. Town of Cromwell, Bd. of Ed.*, 243 F.3d 93, 107–08 (3d Cir. 2001))).

At this phase in the litigation, the record suggests only the possibility that an unspecified ACJ camera—located somewhere in ACJ's "cellblock common area" and controlled or viewed by an unspecified ACJ employee—*might* have captured and recorded for subsequent review the alleged altercation or the room in which it allegedly took place. This showing is insufficient for the court to conclude by a preponderance of the evidence that the September, 21, 2006, video existed, as required to prove spoliation. *See Hammonds*, 2014 WL 2604706, at *1, *4

Absent any reasonably corroborating evidence in the record, plaintiff's unsworn, unsupported, and unverified allegations[21] that "defendants' six ceiling-mounted digital

---

[21] As demonstrated below, plaintiff's Video motion is replete with broad accusations that mischaracterize, misquote, or incorrectly (or fail to) cite to the record. In addition, plaintiff failed to include within the exhibits accompanying his Video and Records motions portions of many of the depositions upon which he bases his spoliation contentions, requiring the court to scour this case's 450+-entry docket for previously-filed depositions to evaluate the veracity of plaintiff's contentions. See, for example:

- (ECF No. 425 at 1 ¶ 4 (citing page "33:15–18" of the Leon deposition, which plaintiff failed to include with Exhibit A));

- (*id.* at 2 ¶ 6 (citing to a portion of the Gasser deposition in which Stanley Winkinoff—attorney for since-terminated defendants Nurse Bethann and Nurse Jane Doe—read Gasser's medical "progress note," to support plaintiff's proposition that "[d]efendants did not preserve any video or photographic evidence" related to the alleged September 21, 2006, assault));

surveillance camera[] system" captured the incident in question are insufficient to prove by a preponderance of the evidence that the September 21, 2006, video existed. *See*

- (*id.* ¶ 7 (citing page "9:13–25" of the Pofi deposition, which plaintiff omitted from Exhibit D));

- (*id.* ¶¶ 8, 9 (no citation to the record));

- (*id.* ¶ 11 (citing page "9:13–18" of the Pofi deposition, which plaintiff omitted from Exhibit D));

- (*id.* ¶ 12 (quoting page "22:13–25" of the Leight deposition at Exhibit G, on which plaintiff himself began—but did not finish—stating, "Pofi usually handled the," to support his own proposition that "Pofi usually handled the videos"; also quoting from page "7:22–25" of the Pastor deposition at Exhibit F, on which Pastor discusses only "Deputy Warden Emerick," to support plaintiff's proposition that "Pofi usually handled the videos"));

- (*id.* ¶ 15 (mischaracterizing page "10:1–6" of Pastor's deposition at Exhibit F, in which plaintiff and Pastor discussed, without context, "review of the video footage," to support plaintiff's contention that "[r]eviewing the video footage before criminal charges were filed against a prisoner has 'always' been part of the review process 'ever since the cameras existed'"));

- (*id.* ¶ 16 (citing page "34:12–15" of Pastor's deposition, which plaintiff omitted from Exhibit F));

- (*id.* ¶ 17 (citing only to plaintiff's amended complaint)); and

- (*id.* at 3, 5 ¶ 23 (citing a May 27, 2011, Federal Bureau of Investigation ("FBI") transcription at Exhibit H, which discusses ACJ officials' alleged loss of video footage relating to the escape of Gary Barbour on April 6, 2010—nearly four years after the September 21, 2006, incident)).

While the court recognizes plaintiff filed his sanctions motions *pro se*, he is cautioned to avoid future mischaracterizations of the record, which can be confusing and time-consuming for the court to analyze.

*Hammonds*, 2014 WL 2604706, at *1; *Brown v. United States*, 45 F. App'x 92, 95 (3d Cir. 2002) (rejecting unsworn allegations unsupported by the record).

Because plaintiff failed make a sufficient showing that the September 21, 2006, video ever existed, he necessarily failed to prove any of the individual defendants controlled it, had a duty to preserve it in advance of this litigation, and in bad faith suppressed or withheld it, as required to show spoliation under *Bull*. *See Hammonds*, 2014 WL 2604706, at *1, *4 ("[The plaintiff] has not supplied any evidence that [videos of the alleged prison assault] existed or were in the care, custody, or control of the individual defendants." (citing *Bull*, 665 F.3d at 73–74)).

Even assuming, *arguendo*, that footage of the area in which the September 21, 2006, altercation took place existed in defendants' control, there is no evidence in the record that any of the individual defendants acted in bad faith by "l[ying] or obfuscat[ing] to prevail in [their] attempt to intentionally withhold" the video from plaintiff. *Bull*, 665 F.3d at 77, 83 (emphasis added). As stated previously, "a finding of bad faith is pivotal to a spoliation determination," and plaintiff bears the burden of proving *intentional* withholding of evidence. *Id.* at 79 (emphasis added). Beyond plaintiff's bare allegations, the record does not show defendants intentionally withheld the alleged video under circumstances demonstrating "fraud" or a "desire to suppress the truth." *Brewer*, 72 F.3d at 334 (bad faith "arises . . . only when the spoliation . . . was intentional[] and indicates fraud and a desire to suppress the truth" (quoting 29 AM. JUR. 2d *Evidence* § 177)). This is true particularly in light of Pastor's deposition testimony that "[ACJ] footage only stays on the hard drive for a certain amount of time," and "if [ACJ staff] wouldn't have

gotten [an inmate] complaint in the time that the video was preserved to the hard drive, [ACJ staff] would not have been able to preserve it to disk." (ECF No. 492-6 at 5:18–25.) Plaintiff failed to offer any evidence that he requested the alleged September 21, 2006, video footage in time for its preservation, and bad faith "does not arise where the destruction [of the evidence] was a matter of routine with no fraudulent intent." *Brewer*, 72 F.3d at 334 (quoting 29 AM. JUR. 2d *Evidence* § 177).

In light of plaintiff's failure to prove the video existed and his "failure to produce any evidence of [his] own" beyond bare allegations that defendants acted in bad faith to destroy the alleged video, the record in this case "supports abiding by a presumption of inadvertence"—not intentional withholding. *Bull*, 665 F.3d at 77.

For these reasons, plaintiff's Video motion will be denied.

## V. CONCLUSION

For the reasons set forth in this memorandum opinion, plaintiff's Records and Video motions will be denied.

An appropriate order will follow.


Dated:        November 12, 2015


                                        /s/ Joy Flowers Conti
                                        Joy Flowers Conti
                                        Chief United States District Judge

46

Cc:

André Jacobs (Inmate #DQ5437)
State Correctional Institute of Albion
10745 PA-18
Albion, PA 16475