**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDRE JACOBS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-470 |
| | ) | |
| v. | ) | |
| | ) | Chief Judge Joy Flowers Conti |
| DETECTIVE RICHARD USNER, | ) | |
| DETECTIVE MICHAEL O'KEEFE, | ) | Magistrate Judge Lisa Pupo Lenihan |
| DAN ONORATO, WILLIAM EMERICK, | ) | |
| RAMON RUSTIN, RONALD POFI, | ) | |
| MAJOR DONNIS, LT. ACJ LOUIS LEON, | ) | |
| DALE CHAPMAN, ROBERT BEVERIDGE, | ) | |
| BOZAK, ROBBIE PINDEL, KAVALS, | ) | ECF No. 456 |
| McCALL, STANTON, RUBEL, and CRAPIS, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that the Motion for Summary filed by moving Defendants Beveridge, Bozak, Chapman, Crapis, Donnis, Emerick, Kavals, Leon, McCall, Pindel, Pofi, Rubel, Rustin, and Stanton (ECF No. 456) be denied.  The motion should be granted as it relates to Defendant Onorato.

### II.  REPORT

Presently before the Court is a Motion for Summary Judgment filed by Defendants Robert Beveridge ("Beveridge"), Bozak, Dale Chapman ("Chapman"), Crapis, Major Donnis ("Donis"),[1] William Emerick ("Emerick"), Kavals, Louis Leon ("Leon"), McCall, Dan Onorato

---

[1] It appears from the summary judgment record that Major Donnis' name is spelled incorrectly. In its Report and Recommendation, the Court will use the correct spelling, which is "Donis."

("Onorato"), Robert Pindel ("Pindel"), Ronald Pofi ("Pofi"), Rubel, Ramon Rustin ("Rustin"), and Stanton (collectively "Defendants").[2]  This is a civil rights action originally commenced by pro se prisoner Andre Jacobs ("Jacobs" or "Plaintiff").  Plaintiff is now represented by counsel.

A.  FACTS

The following facts are taken from the parties' Revised Concise Statements of Material Facts and Responses thereto at ECF Nos. 482, 484, and 485 and are undisputed unless otherwise indicated.  The Court also relies on other relevant portions of the summary judgment record.

In April 2005, Plaintiff was transferred from the custody of the Pennsylvania Department of Corrections ("DOC") to the Allegheny County Jail ("ACJ").  (ECF Nos. 484-2 & 485, ¶ 1.) Plaintiff remained at ACJ until about September 27, 2006, when he was returned to the custody of the DOC.  (ECF Nos. 484-2 & 485, ¶ 2.)  Plaintiff asserts that since leaving the ACJ in 2006, he has been housed again at ACJ on and off in 2007, 2008, 2012, and 2013.  (ECF No. 484-2, ¶ 3.)

Upon arrival at ACJ, Plaintiff was placed in the Disciplinary Housing Unit ("DHU"), although the parties dispute the reason for the placement.  Plaintiff asserts that the placement was arbitrary while Defendants assert that such placement was the result of misconduct.  (ECF Nos. 484-2 & 485, ¶ 5.)  The parties agree, however, that the DHU is a segregation unit housing prisoners who violate ACJ regulations.  (ECF Nos. 484-2 & 485, ¶ 6.)

_____

[2] The Court notes that Defendant Detective Richard Usner ("Usner") and Defendant Detective Michael O'Keefe ("O'Keefe") are not moving Defendants.  It appears that Defendants erroneously concluded that Usner and O'Keefe had been dismissed from the case.  *See* Brief in Support of Defendants' Motion for Summary Judgment, ECF No. 457 at 6-7.  The District Court's June 5, 2014 Order clearly states that Defendants Usner and O'Keefe are remaining defendants.  (June 5, 2014 Order, ECF No. 367.)

The parties disagree about the conditions of confinement within the DHU. According to Plaintiff, prisoners within the DHU are confined to their cells 23 hours per day. The mattresses in the DHU were without coverings and were not sanitized between different prisoners' uses. Plaintiff feared contracting communicable diseases by using the DHU mattresses. While in the DHU, Plaintiff was denied, at times, the ability to exercise outside; denied cleaning supplies, warm clothing, and blankets during periods of cold weather; and provided limited daily food intake. He was also periodically denied access to the medical clinic. While in the DHU, Plaintiff asserts that he lost approximately 33 pounds and suffered hunger pains, chronic headaches, fatigue, and depression. In addition, Plaintiff contends that he had no physical access to the law library or legal materials. Plaintiff indicates that if he wanted any legal material, he was required to request cases by exact legal citation and await a copy. Plaintiff further states that he was not provided written notice or the opportunity for a hearing or other proceeding to contest the Defendants' reasoning for placing him in the DHU. In addition, he asserts that he was not provided a copy of the policies or rules related to DHU placement determinations and appeals. Defendants deny all of these contentions. (ECF Nos. 484-2 & 485, ¶¶ 8-15.)

The parties also disagree concerning Plaintiff's attempts to use the grievance procedures at ACJ. Plaintiff asserts that upon being placed in the DHU, he challenged the conditions in the DHU by filing grievances both verbally and in writing. Plaintiff insists that he submitted complaints informally, then would file a written grievance complaint, and then reassert unanswered grievances orally. Plaintiff indicates that he complained to Defendants Leon, McCall, Donis, Emerick, Onorato, and Rustin. Based on a conversation with Defendant Leon, Plaintiff believed that Leon and other corrections officers would impose unsanitary and illegal conditions upon him within the DHU and/or cause him physical harm in retaliation for filing

future grievances. While housed within the DHU, Plaintiff asserts that he requested a copy of the ACJ grievance procedure. No corrections officer or ACJ official provided him a copy of the ACJ grievance procedure during his time within the DHU. Defendant Emerick testified that he believed a procedure for addressing unanswered complaints was for an inmate to continue to file multiple follow-up grievances. Plaintiff did not know the correct grievance procedure during his stay at ACJ and only became aware of how to lodge complaints through other prisoners, and through trial and error. Defendants deny all of the above. (ECF Nos. 484-2 & 485, ¶¶ 16-22.)

The parties agree that ACJ prisoners can use two (2) forms to file complaints: the "ACJ Official Inmate Complaint Form" and the "Inmate Request to Staff Member." (ECF Nos. 484-2 & 485, ¶ 23.) The parties disagree, however, as to the steps taken by Plaintiff to file complaints. According to Plaintiff, from April 2005 through September 2006, Plaintiff had used these forms 30 or more times to file complaints while in the DHU at ACJ. Plaintiff indicates that he filed both formal and informal complaints, and that both were rarely answered. He did not believe that he could file an appeal to a grievance until he had received an official response to the grievance. Plaintiff's complaints addressed a variety of issues including ACJ prison guards' or officials' conduct, conditions of confinement, or denial of access to medical care. Plaintiff asserts that sometimes he used informal complaints as a method to present his complaints by re-labeling the forms "Substitute Complaint Form." He also copied some of his complaints by hand or used carbon paper. Sometimes he used daily sick call for the sole purpose of filing complaints. Plaintiff reiterated his written complaints orally at his monthly program review committee hearings. He wrote to Defendants Onorato, Rustin, Emerick, Pofi, and Donis concerning all claims contained in his Amended Complaint. He also verbally informed Defendants Emerick, Pofi, and Donis of his concerns. Plaintiff was never interviewed about his

complaints or informed of the results of any investigation, if one occurred.  (ECF Nos. 484-2 & 485, ¶¶ 24-33.)

The parties agree that the ACJ policy concerning inmate complaints requires that after receiving a written complaint, the inmate will be provided a "[r]esponse within a prescribed reasonable time limit with special provisions for responding to emergencies.  The policy further requires "[s]upervisory review of complaints."  The parties further agree that grievance records are to be preserved according to official ACJ policy.  (ECF Nos. 484-2 & 485, ¶¶ 34-36.)

Plaintiff asserts that ACJ officials "mistakenly lost" ten (10) years of grievance records, from 1996 through late 2006, and no such files currently exist.  Plaintiff notes that these lost grievance records cover the entirety of Plaintiff's incarceration at ACJ and begin again after Plaintiff's late 2006 departure from the ACJ.  (ECF No. 484-2, ¶¶ 37-38.)  Defendants deny that the grievance officer was required to maintain a Log of Complaints for any unreasonable period of time, or beyond the monthly reporting period.  (ECF No. 485, ¶¶ 37-38.)

Finally, Plaintiff states that he feared for his safety and believed he would be seriously injured or killed by the guards or ACJ officials if he filed a lawsuit against ACJ guards or officials while still in their custody.  Instead, he waited until his criminal acquittals were complete and he was no longer confined at ACJ.  Defendants state that it was unreasonable for Plaintiff to fear for his safety because he was never seriously injured or killed despite his own aggressive behavior at ACJ, and that in light of his extensive litigation experience, he should have known of the statute of limitations.  (ECF Nos. 484-2 & 485, ¶¶ 41-42.)

On June 1, 2005, a physical altercation took place involving Plaintiff and Defendants Pindel, Leon, and Donis.  Specifically, Plaintiff states that when he was returning from an attorney visit, Pindel repeatedly punched him after Plaintiff's handcuffs were removed.  Another

guard intervened, and re-handcuffed Plaintiff. Although Plaintiff was restrained, on the ground and not resisting, Defendant Pindel continued to punch him about the face and head. Plaintiff states he was bleeding from his head and face and sustained several lumps and bruises. Defendants Leon and Donis arrived at some point. Defendant Leon grabbed Plaintiff and slammed his head against the cell wall and yelled: "I don't care if my officers stick a thumb up your ass, you never put your fucking hands on them or we'll kill you." (Jacobs Affidavit, ECF No. 468-1, ¶ 17.) Thereafter, Plaintiff submitted at least four (4) requests for medical care due to dizziness and at times, a loss of consciousness. According to Plaintiff, the nurse refused to document Plaintiff's injuries for fear of upsetting the guards. Plaintiff states that Defendants O'Keefe, Leon, Pindel and Pofi worked together toward the filing of false charges against him regarding these events. (Jacobs Affidavit, ECF No. 468-1, ¶ 17.) Plaintiff was charged with aggravated assault and disorderly conduct. Plaintiff was tried for these offenses and was acquitted by a jury of all charges on October 15, 2007. Defendants deny these assertions and further indicate that any claims arising from the June 1, 2005 incident are barred by the statute of limitations. (ECF Nos. 484-2 & 485, ¶¶ 43-47.)

Next, Plaintiff describes a physical altercation between Plaintiff and Defendant Beveridge that occurred on July 7, 2005 while Plaintiff was returning to his cell from another attorney visit. Plaintiff states that Defendant Beveridge pushed him from behind while Plaintiff was handcuffed and shackled, causing Plaintiff to fall down the stairs. Plaintiff further states that once he reached his cell, Beveridge sprayed him in the face with mace or a similar substance. Beveridge punched Plaintiff in the head, face and body until he fell to the cell floor. Then, Beveridge kicked him repeatedly. (Jacobs Affidavit, ECF No. 468-1, ¶ 18.) Plaintiff indicates that he sustained severe pain and damage to his eyes and numerous lumps and bruises and a

burning sensation on his skin. Plaintiff requested medical care after the incident but it was denied. Plaintiff states that prior to the incident, he and his attorney made verbal and written requests to Defendants Emerick, Rustin, and Donis that Defendant Pindel and Beveridge be separated from Plaintiff due to threats and hostilities against him, but these requests were ignored. (Jacobs Affidavit, ECF No. 468-1, ¶ 18.) As a result of this incident, Plaintiff was charged with aggravated assault and disorderly conduct. Plaintiff was tried for these offenses and a jury acquitted him of all charges on October 21, 2007. Plaintiff states that these charges were fabricated by Defendants O'Keefe, Leon, Donis, Beveridge and Pofi. (Jacobs Affidavit, ECF No. 468-1, ¶ 18.) Defendants deny these statements and add that any claims arising from these events are barred by the statute of limitations. (ECF Nos. 484-2 & 485, ¶¶ 48-52.)

On July 25, 2005, Plaintiff states that after a cell search conducted in the DHU, Defendants Stanton, Rubel, and Crapis allegedly discovered a piece of metal in Plaintiff's cell. Plaintiff asserts that Defendants Stanton, Rubel, and Crapis planted the piece of metal. Defendant Crapis issued a misconduct report implicating that Plaintiff knowingly possessed the piece of metal. As a result of this incident, Plaintiff was charged with criminal misconduct. The charges arising out of July 25, 2005 incident were subsequently withdrawn as unsubstantiated. Defendants deny these statements and add that any claims arising from these events are barred by the statute of limitations. (ECF Nos. 484-2 & 485, ¶¶ 53-57.)

On or around September 15, 2006, Plaintiff was being escorted to the showers in the DHU by Defendant Chapman. Plaintiff was handcuffed behind his back while Defendant Chapman held the tether attached to Plaintiff's handcuffs. During this time, Plaintiff fell as he was going up the steps, pulling a hamstring in his right leg. Plaintiff states that he screamed in pain, while Defendant Chapman laughed and responded, "Oops. I'm tampering with your mail,

right?"  Plaintiff asserts that Chapman was referring to the multiple complaints that he had filed

against Chapman for destroying his incoming and outgoing mail days and weeks prior.  (Jacobs

Affidavit, ECF No. 468-1, ¶ 21.)  Plaintiff was carried back to his cell.  Another DHU inmate,

Jheri Matthews, could not see this incident, but heard a loud noise, which he identified as a

"thump as [Defendant Chapman and Plaintiff] were going up the stairs."  Defendants deny these

statements indicating that there is no credible evidence to support them.  (ECF Nos. 484-2 &

485, ¶¶ 58-59.)

On September 21, 2006, during a strip search, a physical altercation occurred between

Plaintiff and Defendants McCall, Kavals, Bozak, and Leon.  Plaintiff was stripped searched for a

second time.  His Affidavit provides in part as follows:

> When I refused to let Defendant Leon place the flashlight
> in my rectum, Defendants Leon, McCall, Kavals, and Bozak
> immediately attacked me by slamming my naked body on the
> metal bed frame and punching, kicking, slapping, and choking me.
> They also threatened me with death.  While Defendant Leon
> pinned me down with his full body weight, Defendant Bozak was
> twisting my right leg, which he knew was injured, and kept
> screaming, "turn over, turn over!"  I did not resist.  I was then
> handcuffed and slammed to the cell floor where Defendants Leon
> and McCall repeatedly kicked and punched me in the face.  I was
> then yanked up by the handcuffs and pushed and kicked across the
> tier by Defendant Leon while naked and leaking blood from my
> face.  Upon removing me from the cell, Defendant Leon slapped
> me on the buttocks with his hand and screamed, "You're mine
> now, bitch!"

(Jacobs Affidavit, ECF No. 468-1, ¶ 22.)  Plaintiff was injured during this altercation and

received medical care for these injuries.  Plaintiff's attorney observed Plaintiff's injuries and

notified ACJ in writing of his concerns regarding the injuries.  Defendants deny these statements

and indicate that there is no credible evidence to support them.  (ECF Nos. 484-2 & 485, ¶¶ 60-

63.)

The parties agree that the May 15, 2006 ACJ Use of Force Policy states that it is ACJ policy to "report, document and review all incidents of use of force." It further states that "[a]ny staff member who uses physical force is required to report such use of force to the Shift Commander as soon as possible." The policy also requires that incidents involving the use of force be reported up the chain of command to the Warden's Office. Written reports are required from the "person who applied the force and from all who witnessed or were involved in the incident," including the date, time, location, events leading up to the use of force, descriptions of the reasons why force was used, descriptions of the methods of force, description of weapons, lists of all witnesses, and a description of all injuries sustained by staff or inmates. (ECF Nos. 484-2 & 485, ¶¶ 64-67.) Plaintiff asserts that Defendants did not produce relevant reports of incidents of use of force involving Plaintiff either because they were not created, or because they were lost or destroyed while in the custody of ACJ. Defendants deny these assertions. (ECF Nos. 484-2 & 485, ¶¶ 68-69.)

Matthew Solomon of the Federal Bureau of Investigations ("FBI") conducted an investigation in 2011 of prisoner abuse allegations at the Allegheny County Jail. During his investigation, FBI Agent Solomon interviewed Thomas Leicht, former Captain of the ACJ Internal Affairs Department. Leicht stated that he "got the impression that Emerick believed that it was acceptable to abuse inmates." Defendants neither admit nor deny the above facts stating that they are irrelevant to the alleged claims. (ECF Nos. 484-2 & 485, ¶¶ 70-72.)

B. LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to

interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

C. ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate

that the conduct in the complaint was committed by a person or entity acting under color of state

law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the

Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36

F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a

remedy for violations of those rights created by the United States Constitution or federal law.

*Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).


   1. ALLEGED INCIDENTS OCCURRING PRIOR TO APRIL 7, 2006.

   Moving Defendants' only argument regarding Plaintiff's claims relating to alleged events

occurring prior to April 7, 2006 is that such claims are barred by the statute of limitations, and

that equitable tolling is inapplicable. (Defendants' Brief in Support of Summary Judgment, ECF

No. 457 at 8-10.) Specifically, Defendants argue that Plaintiff's Complaint was received by the

Clerk of Court on April 7, 2008. Therefore, according to Defendants, any claims relating to

incidents that occurred before April 7, 2006 are time barred, namely Counts one through five,[3]

and Counts eight through ten of the Amended Complaint (ECF No. 55). Defendants then

conclude that only Count Six and Count Seven "are not effectively barred by the applicable

---

[3] Initially, Defendants mistakenly state that Count Six is included as one of the counts that is time barred, but in the following sentence, Defendants correctly indicate that only Counts Six and Seven are not time barred, assuming that their argument is valid. (Defendants' Brief in Support of Summary Judgment, ECF No. 457 at 10.)

statute of limitations." (Defendants' Brief in Support of Summary Judgment, ECF No. 457 at 10.)

Plaintiff responds that the claims related to the 2005 incidents are not time barred because the claims did not accrue until his acquittal of the underlying criminal proceedings, and are entitled to equitable tolling due to extraordinary circumstances. (Plaintiff's Responsive Brief, ECF No. 468 at 2-7.)

Congress has not established a time limitation for a § 1983 cause of action. *Wilson v. Garcia*, 471 U.S. 261, 266 (1985), *superseded by statute as recognized in, Kasteleba v. Judge*, 325 F. App'x 153, 156 (3d Cir. 2009). The United States Supreme Court has indicated, however, that courts are to consider § 1983 actions as tort actions and borrow the statute of limitations for state tort causes of action. *Wilson*, 471 U.S. at 278. In Pennsylvania, the statute of limitations for tort actions is two years. 42 Pa. Con. Stat. Ann. § 5524. Therefore, for § 1983 actions brought in Pennsylvania federal courts, the appropriate limitations period is two years. *See Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985). In addition, a state's tolling principles apply to § 1983 claims when those principles do not conflict with federal law. *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009).

In *Pearson v. Sec'y Dep't of Corrs.*, 775 F.3d 598, 602-603 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit focused upon the interplay between a Pennsylvania tolling principle and a federal statute. The court of appeals discussed the Pennsylvania tolling principle which provides that "[w]here the commencement of a civil action or proceeding has been stayed by a court or *by statutory prohibition*, the duration of the stay is not a part of the time within which the action or proceeding must be commenced." *Id.* at 602 (citing 42 Pa. Cons. Stat. § 5535(b)) (emphasis added). Relatedly, the Prison Litigation Reform Act ("PLRA") states

that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The court of appeals concluded that the PLRA's exhaustion requirement is a "statutory prohibition" under Pennsylvania's tolling statute. *Pearson*, 775 F.3d at 602-03. Therefore, because exhaustion of prison administrative remedies is mandatory under the PLRA, the two-year statute of limitations applicable to § 1983 actions should be tolled while a prisoner exhausts. *Id.*

Here, Plaintiff has come forward with evidence that the ACJ failed to follow its own procedures concerning exhaustion of administrative remedies. Defendant Emerick testified in deposition that the 1996 grievance directive was in effect at the ACJ from 2004 through 2006. (Emerick Deposition, ECF No. 468-7 at 55-56.) This 1996 grievance directive requires a response to an inmate grievance within seven days. (1996 Inmate Complaint System, ECF No. 468-6 at 6.) Plaintiff has come forward with evidence that from April 2005 through September 2006, Plaintiff submitted the ACJ Official Inmate Complaint Form, or the Inmate Request to Staff Member form at least 31 or more times while in the DHU at ACJ where he received no response from ACJ officials. See Inmate Grievance Forms, ECF No. 468-4 at 4-7, 9-18, 20-21, 25-35, 38, 40, 43, 44.)[4] These unanswered grievances included alleged incidents occurring prior to April 7, 2006 as follows:

---

[4] It appears that Plaintiff retained copies of grievances when possible. He states in his affidavit that he "copied a lot of my complaints by hand or used carbon paper, when I could acquire carbon paper." (Jacobs Affidavit, ECF No. 468-1, ¶ 12.) According to Deputy Warden Emerick, the grievance ledgers were "mistakenly lost[,]" and the ACJ has no grievance ledgers for any period between 1996 through 2006. (Emerick Dep., ECF No. 468-3 at 31.) Plaintiff left the ACJ in late September 2006. (ECF Nos. 484-2 & 485, ¶ 2.)

1. May 4, 2005: Written request to Emerick to remove Plaintiff from DHU; notice of lack of law library. (ECF No. 468-4 at 4.)

2. May 9, 2005: Written complaint to Emerick about being erroneously placed on restriction, death threats, food deprivation, and harassment by Defendants Beveridge and Pindel. (ECF No. 468-4 at 5.)

3. June 10, 2005: Written grievance against Pindel for assault and against Donis and Leon for denial of medical care. (ECF No. 468-4 at 7.)

4. July 7, 2005: Written complaint to ACJ medical clinic regarding assault, identifying injuries, and denial of medical care. (ECF No. 468-4 at 10.)

5. July 7, 2005: Written request to Emerick asking what steps he took to prevent further confrontation with Beveridge; requested investigation. (ECF No. 468-4 at 11.)

6. July 7, 2005: Written complaint to prison Internal Affairs notifying them that Beveridge assaulted Plaintiff and requesting criminal charges. (ECF No. 468-4 at 12.)

7. July 7, 2005: Written request to Leon for action regarding threat against Plaintiff by Officer Duffy (incorrectly identified as Dinardo) based on Beveridge's false claim of assault. (ECF No. 468-4 at 13.)

8. July 7, 2005: Written request to Donis for action regarding harassment by Beveridge and request for separation. (ECF No. 468-4 at 14.)

9. July 8, 2005: Written follow-up to Leon regarding July 7, 2005 complaint providing correct identity of Officer Duffy. (ECF No. 468-4 at 15.)

10. July 8, 2005: Written complaint to Emerick regarding Officers Rubel and Chamacho depriving me of a dinner meal and erroneously being placed on reduced "bag meal" rations. (ECF No. 468-4 at 16.)

11. July 19, 2005: Written substitute complaint form requesting follow-up to Plaintiff's initial complaint regarding Beveridge's assault, requesting separation and protection from Beveridge, and reiterating harassment by Beveridge and Pindel. (ECF No. 468-4 at 17.)

12. July 22, 2005: Written substitute complaint form submitted to grievance officer regarding threat by Beveridge and harassment/use of force by other corrections officers, and requesting separation from the officer and protection from further abuse. (ECF No. 468-4 at 18.)

13. July 25, 2005: Written complaint to Rustin regarding DHU cell searches, planted contraband, and request for protection from harassment, fear, retaliation, false charges, and separation from harassing officers including Rubel, Crapis, and Beveridge. (ECF No. 468-4 at 20.)

14. July 25, 2005: Written substitute grievance form submitted to grievance officer regarding DHU cell searches and planted contraband; request for protection from harassment, fear, and retaliation; and request for separation from harassing officers. (ECF No. 468-4 at 21.)

15. February 27, 2006: Written complaint to Donis regarding continued restriction and housing in the DHU. (ECF No. 468-4 at 25.)

16. February 27, 2006: Written complaint to Rustin regarding continued restriction and housing in the DHU, suspected retaliation for filing complaints, and refusal of medical treatment. (ECF No. 468-4 at 26.)

17. March 19, 2006: Written grievance to Captain Reese regarding harassment by Officer Best, threats of retaliation for filing complaints, and threats of mail tampering. (ECF No. 468-4 at 27.)

18. March 19, 2006: Written substitute complaint form designated "Urgent" to Rustin regarding harassment by Officer Best, threats of retaliation for filing complaints, and threats of mail tampering. (ECF No. 468-4 at 28.)

19. March 21, 2006: Written complaint to Emerick regarding denial of recreation and continuing restriction while in DHU. (ECF No. 468-4 at 28.)

20. March 29, 2006: Written substitute grievance form submitted to Captain Reese regarding retaliation by Defendant Leon for filing complaints; specifically, a cell search and destruction of legal and other personal materials. (ECF No. 468-4 at 30.)

Defendant Emerick testified in deposition that contrary to the official ACJ Inmate Complaint System, if an inmate files a grievance that goes unanswered, the inmate is expected to file another grievance, and another if the second grievance also goes unanswered. (Emerick Dep., ECF No. 468-7 at 44.) As listed above, the summary judgment record reveals that Plaintiff filed a flurry of grievances regarding incidents in issue and that that Defendants did not follow the ACJ grievance procedure in effect at the time of Plaintiff's incarceration. There is nothing in the ACJ 1996 Inmate Complaint System that requires or permits an inmate to move to the next level of the process from an unanswered grievance. *Cf. Kemp v. PICC*, Civil Action No. 14-3819, 2016 WL 1106872, at *10 (E.D. Pa. March 22, 2016) (where grievance policy provided for appeal to next level upon expiration of a time limit at any stage of the process, inmate did not exhaust his administrative remedies where he failed to appeal unanswered grievance.) Plaintiff

comes forward with evidence that he attempted to make himself heard: he complained verbally to prison officials, wrote letters, and asked lawyers and loved ones to call the ACJ. (Jacobs Affidavit, ECF No. 468-1, ¶¶ 6, 12, 13.) Plaintiff also informed his criminal defense attorney about ACJ officials refusing to process or respond to his grievances. He asked his defense attorneys to write letters and make calls on his behalf. Plaintiff's attorney assigned an investigator, Anita Merlino, who discovered that no record was made of Plaintiff's complaints. (Jacobs Affidavit, ECF No. 468-1, ¶ 11; ECF No. 468-5 at 5.) Importantly, Plaintiff comes forward with the affidavit of ACJ fellow inmate, Jamar Travillion, who states "[ACJ] has a vociferous unwritten policy of refusing to respond and/or acknowledge inmate complaints as required by their own written policy/procedures." (ECF No. 468-17 at 1.)

Consequently, pursuant to *Pearson*, the statute of limitations with regard to Plaintiff's civil actions would be tolled until the date that he could no longer complete the exhaustion of his pending complaints. 775 F.3d at 602-03. In this case, where Defendants failed repeatedly to follow ACJ's grievance procedures, this date would have been when Plaintiff left the ACJ and returned to the DOC on September 27, 2006. *Cf.* 2005 ACJ Inmate Complaint System, ECF No. 468-6 at 5 ("Prisoners who have a pending complaint at the time of release lose all standing with [] respect to any further internal administrative remedy of the matter under consideration."). Therefore, the statute of limitations with regard to all claims grieved and left unanswered would begin to run on September 27, 2006. Although Plaintiff delivered his Complaint to the Clerk of Court on April 7, 2008, the Complaint was apparently signed by Plaintiff on April 1, 2008. Thus, for purposes of applying the statute of limitations, this Court will treat April 1, 2008 as the relevant filing date pursuant to the prison mailbox rule. *See Pearson*, 775 F.3d at 600 n.2 (applying prison mailbox rule in § 1983 action and determining that pro se prisoner filed

complaint on date he signed it). Therefore, Plaintiff's claims relating to the alleged incidents while at the ACJ from April 2005 to April 7, 2006 are not time barred. Because "the PLRA is a statutory prohibition that tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies," this Court need not discuss the parties' federal equitable tolling arguments. *See Pearson*, 775 F.3d at 603-04. Therefore, Defendants' Motion for Summary Judgment relating to Plaintiff's claims concerning the events occurring prior to April 7, 2006 should be denied. [5]

### 2. SEPTEMBER 15, 2006, AND SEPTEMBER 21, 2006 EVENTS.

Defendants contend that the events of September 15, 2006 and September 21, 2006 are based solely on Plaintiff's own bald assertions, and are supported by nothing more than conclusory, self-serving evidence and that judgment must be entered in their favor as a matter of law. Plaintiff responds that he has come forward with record evidence to raise a disputed issue of material fact as to these alleged constitutional injuries.

As noted above, on summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249-50. Here, Plaintiff comes forward with sufficient evidence in the form of affidavits and deposition testimony[6] such that a jury could return a verdict in the Plaintiff's favor. *See id.*

---

[5] The parties spend considerable argument as to when the causes of action accrued relating to his underlying criminal proceedings. *See* Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment, ECF No. 468 at 2-3; Defendants' Reply Brief, ECF No. 475 at 2-5. Because *Pearson* requires the tolling of the statute of limitations until Plaintiff has exhausted his administrative remedies, the Court need not reach these arguments.

[6] Plaintiff took written depositions of ACJ inmates pursuant to Federal Rule of Civil Procedure 31.

First, with regard to the September 15, 2006 incident, Plaintiff submits his own affidavit detailing the facts of the events that took place in the DHU showers involving Defendant Chapman. The Affidavit provides as follows:

> On or about September 15, 2006, I was being escorted to the showers in the DHU by Defendant Chapman. I was handcuffed behind my back, and Defendant Chapman deliberately and suddenly yanked the tether, also called a "dog leash," attached to my handcuffs. His conduct pulled me off balance as I was going up the steps. I tried to regain my balance with no assistance from Defendant Chapman, and I dropped into a vertical split position, pulling a hamstring in my right leg. I screamed in pain as Defendant Chapman laughed and responded, "Oops. I'm tampering with your mail, right?" He was clearly referring to the multiple complaints I filed against him for destroying my incoming and outgoing mail days and weeks prior. I perceived this as an act of retaliation. I was carried back to my cell where I laid virtually immobile and in pain for several days, and my leg is permanently damaged.

(Affidavit of Andre Jacobs, ECF No. 468-1 at 9-10, ¶ 21.)

In addition, Plaintiff submits the Deposition Upon Written Questions of Jheri Matthews. Matthews states that he was housed in the DHU approximately 5-6 times during 2006 and first met Plaintiff in the DHU in 2006. Matthews describes an incident in August 2006 where he remembers hearing Plaintiff and Defendant Chapman exchanging words as Defendant Chapman escorted Plaintiff to the shower. Matthews continues that he heard a thump "like someone fell or something heavy dropped down the steps." (Matthews Dep. Upon Written Questions, ECF No. 468-8 at 4, ¶ 7.) Matthews furthers states that he witnessed an altercation in front of Plaintiff's door. Matthews states that shortly thereafter, Defendant "Chapman was on top of [Plaintiff] and through cries of pain I heard [Plaintiff] cry: ["]Take these[] cuffs off me." (*Id.*)

In a subsequent paragraph the following question is posed to Mathews:

> Question: In early August, 2006, Mr. Jacobs claims that prison guard Dale Chapman pulled him down the DHU stairs as he was

going up to the shower, causing Mr. Jacobs to do a split and pull
his hamstring leg muscle. Set forth your knowledge of the facts
surrounding this incident and explain how you know these facts.

Answer: I wasn't able to see c/o Chapman's actions but I heard
them arguing and a loud noise in the middle of their argument.
Mr. Jacobs showers by himself and they were the only two out
when I heard a thump as they were going up the steps.

(Matthews Dep. Upon Written Questions, ECF No. 468-8 at 4, ¶ 11.) Clearly, Plaintiff has come

forward with evidence to raise a disputed issue of material fact as to whether Defendant

Chapman violated his constitutional rights.[7] Therefore, Defendants' Motion for Summary

Judgment on this issue should be denied.

Plaintiff comes forward with more evidence as to the events of September 21, 2006.

First, Plaintiff states the following in his affidavit:

On September 21, 2006, Defendants McCall, Kavals, and Bozak
strip-searched me and searched my cell. No contraband was
found. Defendant McCall instructed Defendant Kavals to "pat
search" me. Defendant Kavals ran his hands about my body and
private areas. Seeing that I did not react to this degrading conduct,
Defendant McCall ordered another strip search. As I stripped
naked again, Defendant McCall left my cell and returned with
Defendant Leon. I heard Defendant McCall tell Defendant Leon to
"look at this guy's cock." Defendant Leon told me to "lift [my]
dick and balls" and continued to order me to display my private
areas. I complied with his instructions until Defendant Leon, who
is not a medical professional, attempt to stick a flashlight in my
rectum, claiming he was searching for contraband. In light of the
degradation and humiliation to which I was subjected, I perceived
this as a sadistic and abusive act and an assault, as I had never
before been subjected to a rectal search. When I refused to let
Defendant Leon place the flashlight in my rectum, all the
Defendants, Leon, McCall, Kavals, and Bozak, immediately
attacked me by slamming my naked body on the metal bed frame
and punching, kicking, slapping, and choking me. They also
threatened me with death. While Defendant Leon pinned me down

_____

[7] Although there is some disparity as to whether the events occurred in August or on September
15, 2006, the substance of what occurred is consistent.

19

> with his full body weight, Defendant Bozak was twisting my right
> leg, which he knew was injured, and kept screaming, "turn over,
> turn over!" I did not resist. I was then handcuffed and slammed to
> the cell floor where Defendants Leon and McCall repeatedly
> kicked and punched me in the face. I was then yanked up by the
> handcuffs and pushed and kicked across the tier by Defendant
> Leon while naked and leaking blood from my face. Upon
> removing me from the cell, Defendant Leon slapped me on the
> buttocks with his hand and screamed, "You're mine now, bitch!"
> Defendant Bozak further aggravated my preexisting leg injury, and
> all of these Defendants contributed to the physical pain,
> humiliation, and mental anguish I suffered as a result of this attack.
> I was subsequently refused appropriate medical care for my
> injuries, causing poor healing and scarring to my face.

(Jacobs Affidabvit, ECF No. 468-1 at 9-10, ¶ 22.) Plaintiff also comes forward with the

following: 1) the Deposition Upon Written Questions of Derrick Hampton who witnessed an

incident in September 2006 where he observed Defendants Leon, McCall and Bozak dragging

Plaintiff across the cell floor and Leon striking Plaintiff. (Hampton Dep. Upon Written

Questions, ECF No. 468-9 at 4, ¶¶ 7 & 12.); 2) Deposition of Kimberly Gasser who testified that

she was the nurse who treated Plaintiff for the injuries he sustained that day. (Gasser Dep., ECF

No. 468-10 at 16-17, 18.); 3) Deposition of Louis Leon whose testimony indicates that the only

force used that day was that Plaintiff was taken to the ground by Defendant Kavals when he

refused to comply with the instructions of the strip search, and attempted to strike Defendant

Leon in the face. (Leon Dep., ECF No. 468-11 at 28-38.); 4) September 22, 2006 letter to

Defendant Rustin from Jay Finkelstein, a federal public defender representing Plaintiff at the

time, notifying Rustin that he had met with his client that day and that Plaintiff was in need of

medical attention. Attorney Finkelstein noted that Plaintiff had "a severely swollen right cheek,

a deep wound on his forehead, various open wounds and cuts on his face." (September 22, 2006

Finkelstein letter to Rustin, ECF No. 468-12 at 2.); 5) Affidavit of Leonard Matthews detailing

what he had witnessed on September 21, 2006, including the following:

> Mr. Jacobs was handcuffed from behind with a leash attached to
> the back of the cuffs.  C/O Bosak came out of Mr. Jacobs' cell and
> called for Lt. Leon while Lt. McCall was already present.  Lt. Leon
> placed on his black gloves and begin [sic] pushing Mr. Jacobs
> around.  I then heard Lt. Leon yelling foul words at Mr. Jacobs.
> Moments later Mr. Jacobs was placed up against the wall naked
> and blood was running down his entire face.  Lt. Leon then
> smacked Mr. Jacobs on his buttocks, and stated "Your [sic] my
> new bitch."

(Affidavit of Leonard Matthews, ECF No. 468-13 at 2.); 6) Incident reports from ACJ and

County Police indicating that Plaintiff attempted to assault Defendant Leon and made threats

against him.  The ACJ reports were dated September 21, and indicated that Plaintiff was seen in

medical and cleared.  The County Police investigative report indicates that charges would be

filed against Plaintiff.  (ACJ and County Police Reports of September 21, 2006 incident, ECF

No. 468-14 at 2-5.); and 7) Allegheny Correctional Health Services, Inc. Progress Notes

reflecting Plaintiff's injuries and various complaints.  (Progress Notes, ECF No. 468-15 at 2-5.)

Clearly, Plaintiff has come forward with evidence to raise a genuine issue of material fact

as to whether his constitutional rights were violated as a result of the incidents on September 15,

2006, and September 21, 2006.  Therefore, Defendants' Motion for Summary Judgment on the

claims relating to the incidents of September 15, 2006 and September 21, 2006 should be denied.


3.  PERSONAL INVOLVEMENT OF ONORATO, RUSTIN, EMERICK, POFI, AND
    DONIS

Defendants argue that summary judgment must be granted in favor of Defendants

Onorato, Rustin, Emerick, Pofi, and Donis for lack of personal involvement.  Defendants focus

on the averments of the Amended Complaint and the fact that Plaintiff fails to aver how each of these Defendants participated in the alleged constitutional violations. Plaintiff responds that these Defendants were responsible for developing and administering jail policy including the Inmate Grievance System and Use of Force Policies, with Rustin, Emerick and Pofi specifically responsible for the administration of the grievance system. Therefore, according to Plaintiff, these Defendants are liable under a supervisory liability theory.

"'A[n] individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Here, Defendants focus on the averments of the Amended Complaint in support of their arguments that Defendants Onorato, Rustin, Emerick, Pofi, and Donis had no personal involvement in the alleged wrongdoing. As to Defendant Onorato, Plaintiff only comes forward with the statements in his affidavit that he "complained to" Onorato regarding the conditions in the DHU. No further detail is given regarding this "complaint." (Jacobs Affidavit, ECF No. 468-1, ¶ 6.) Thereafter, Plaintiff states that he "personally wrote to" Onorato "concerning all claims contained in [the] Amended Complaint." (Jacobs Affidavit, ECF No. 468-1, ¶ 13.) The Court could uncover no other references to Defendant Onorato in the summary judgment record, and Plaintiff has directed the Court to none. Without more, Plaintiff has failed to raise a genuine issue of material fact as to the personal involvement of Defendant Onorato "in the alleged wrongdoing." *See Evancho*, 423 F.3d at 353. Therefore, Defendants' Motion for Summary Judgment should be granted as it relates to Defendant Onorato.

As to the other Defendants, Plaintiff comes forward with evidence that Rustin, as Warden of ACJ, Emerick, Deputy Warden of ACJ, and Pofi, an Internal Affairs official, were responsible for the administration and oversight of the grievance system and Use of Force Policy during the relevant time period.  Further, as a security officer at ACJ, Donis was responsible for enforcement of its rules and policies.  Plaintiff asserts that these Defendants are liable in a supervisory liability capacity for the failure of the ACJ to follow its own policies.

The United States Court of Appeals for the Third Circuit set forth the standard for imposing liability against a supervisor pursuant to § 1983 in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989).  Relying on the precepts set forth by the United States Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989), the *Sample* court noted that "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person'–whether a natural one or a municipality–has exhibited deliberate indifference to the plight of the person deprived."  *Sample*, 885 F.2d at 1118 (internal citation omitted).  The Court continued that in order to establish supervisory liability, the plaintiff must identify a specific supervisory practice or procedure that the defendant failed to employ, that the existing custom or practice without that specific practice or procedure created an unreasonable risk of harm, that defendant was aware that this unreasonable risk existed, that defendant was indifferent to that risk, and that plaintiff's harm resulted from defendant's failure to employ that supervisory practice or procedure.  885 F.2d at 1118.

In addition, there may be cases where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." *Id.*  In this instance, it is important for the court to discuss whether the

Plaintiff has established the inference on all three issues. *Id.*

As to causation, the *Sample* court concluded as follows:

> On remand, the district court should bear in mind that under the teachings of *City of Canton* it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did. The district court must insist that [plaintiff] identify specifically what it is that [defendant] failed to do that evidences his deliberate indifference. Only in the context of a specific defalcation on the part of the supervisory official can the court assess whether the official's conduct evidenced deliberate indifference and whether there is a close causal relationship between the "identified deficiency" and the "ultimate injury."

*Sample*, 885 F.2d at 1118.

Here, Plaintiff comes forward with evidence that Rustin, Emerick, Pofi, and Donis were responsible for the administration of the ACJ inmate grievance system and Use of Force Policy and failed to follow their mandated procedures. Evidence of record reflects that as a result of Plaintiff's numerous grievances, Rustin, Emerick, and Pofi were aware of the violations of Plaintiff's rights by ACJ corrections officers. In fact, in light of the grievances and oral complaints by Plaintiff and other inmates, these Defendants were also aware that pursuant to the ACJ Use of Force Policy, use of force reports were either reviewed and left unresolved, or not submitted at all. Most importantly, the practice of simply ignoring its own policies created "the risk of constitutionally cognizable harm [ ] so great and so obvious that the risk and the failure of [these] supervisory officials to [follow ACJ's own policies] [ ] alone" raise the inference of the existence of an unreasonable risk, of the supervisory officials' knowledge of that risk, and of their indifference to it." *See id.* That is, by failing to follow its own inmate grievance procedures and use of force reporting requirements, these officials created an unreasonable risk of constitutionally cognizable harm where jail officials' behavior would be left virtually unchecked

in light of the total absence of accountability.  With no accountability, the risk that corrections

officers would violate inmates' constitutional rights was almost a certainty.  To this end, Plaintiff

submits the affidavit of fellow ACJ inmate, Jamar Travillion, who states that ACJ "has created a

total state of anarchy among A.C.J. Corrections Officers et al. because they [ ] know that any

and/or all inmate grievances will go unheeded and then, undisciplined."  (ECF No. 468-17 at 1-

2.)  In addition, Plaintiff comes forward with evidence of repeated uses of excessive force at ACJ

and ACJ's failure to follow its own grievance procedures during the relevant time period.  (*See

e.g.*, Crisswalle Affidavit, ECF No. 468-18 at 5 (Defendant Pindel requesting that Crisswale

"fuck up Jacobs real bad" because "he keeps filing complaints against me."); Surratt Affidavit,

ECF No. 468-18 at 6 (describing excessive use of force by Defendant Leon against Surratt

because Surratt requested a complaint form, and against Plaintiff after he had just been assaulted

by Defendant Pindel an hour earlier; witnessing Pindel's assault on Jacobs after Jacobs was

down on the ground and handcuffed); Keys Dep. On Written Questions, ECF No. 468-18 at 14

("Lt. Leon is known for using martial arts to abuse inmates."); Nixon Dep. On Written

Questions, ECF No. 468-18 at 29-49 (describing assaults by Donis and Leon and the delay of

medical care until injuries subsided).  *See also supra*, at II.C.1. (discussion of Plaintiff's

numerous unanswered grievances and citations to record therein)).  Therefore, it is respectfully

recommended that the Motion for Summary Judgment for lack of personal involvement should

be denied as it relates to Rustin, Emerick, Pofi, and Donis pursuant to the theory of supervisory

liability.

   In addition, as to Defendant Donis, Plaintiff also comes forward with evidence that Donis

was involved in the June 1, 2005 incident where Defendant Pindel beat Plaintiff even though he

was restrained and not resisting.  Plaintiff states that Donis observed Plaintiff's injuries but

denied him medical care. (Jacobs Affidavit, ECF No. 468-1, ¶ 17.) Plaintiff also comes forward with evidence that as to the July 7, 2005 beating by Defendant Beveridge, Donis was involved in the bringing of false criminal charges for which Plaintiff was acquitted after a jury trial. (Jacobs Affidavit, ECF No. 468-1, ¶ 18.) Therefore, Defendants' Motion for Summary Judgment as it relates to Defendant Donis for lack of personal involvement should also be denied on this basis.

4. OFFICIAL CAPACITY

Defendants argue that the claims against the individual Defendants in their official capacities must be dismissed as a matter of law because official capacity claims are actually claims against the entity for which the individuals are employed, and Allegheny County is not a named Defendant. Plaintiff responds that his claims against the individual Defendants in their official capacities are twofold: 1) Plaintiff seeks prospective injunctive relief against the individual Defendants in their official capacities and therefore are proper; and 2) Plaintiff's claims against the individual Defendants in their official capacities for monetary damages should be construed against Allegheny County, which was on notice of this civil rights actions because the individual Defendants were named in their official capacities.

The Court's analysis on this issue necessarily involves an examination of certain entries on the voluminous docket in this case. On April 4, 2008, Plaintiff's Complaint was received by the Clerk of Courts. Allegheny County Bureau of Corrections was named as a defendant. In addition, all individual defendants were named in "their individual and/or official capacities, where applicable." (ECF No. 1, ¶ 16.)

On October 21, 2008, Magistrate Judge Cathy Bissoon entered an order dismissing the Allegheny County Bureau of Corrections without prejudice because Plaintiff failed to provide

directions and service documents for the Bureau of Corrections after being directed on five occasions to do so.  (Oct. 21, 2008 Order, ECF No. 16.)

On April 6, 2009, Plaintiff filed an Amended Complaint.  Plaintiff did not name the Allegheny County Bureau of Corrections.  Plaintiff, however, again named all individual ACJ Defendants in "their individual and/or official capacities."  (Amended Complaint, ECF No. 55, ¶ 14.)

Official capacity lawsuits "'generally represent only another way of pleading an action against an entity of which an officer is an agent,'" and thus are duplicative of the claims against the entity.  *Gregory v. Chehi,* 843 F.2d 111, 120 (3d Cir. 1988) (quoting *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 n. 55 (1977)) (other citations omitted).  *See also Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Here, although Allegheny County is not a named Defendant, the individual ACJ Defendants have been named in their individual and official capacities since the commencement of this civil action in 2008.  Thus, the official capacity claims directed to the ACJ individual Defendants should not be dismissed.  Therefore, it is respectfully recommended that Defendants' Motion for Summary Judgment to dismiss the official capacity claims against the individual ACJ Defendants be denied.[8]

---

[8] Because the ACJ is a county entity rather than a state entity, Plaintiff's argument concerning prospective injunctive relief against the individual Defendants in their official capacities as it relates to the doctrine of *Ex Parte Young,* 209 U.S. 123, 155-56 (1908), is not applicable.  *See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 323 (3d Cir. 2002) (Exception noted to rule that Eleventh Amendment bar applies to actions in federal court against state officials acting in their official capacity for money damages or back pay where "suits against individual state officers [are] for prospective injunctive and declaratory relief to end an ongoing violation of federal law.")

5.  QUALIFIED IMMUNITY

The individual Defendants argue that they are protected by qualified immunity because the averments of the Amended Complaint do not allege a violation of clearly established law. Plaintiff responds that the Defendants are not protected by qualified immunity because Defendants violated clearly established constitutional rights, and these Defendants could not have reasonably believed that their conduct was lawful.

State officials performing discretionary acts enjoy "qualified immunity" from money damages in § 1983 causes of action when their conduct does not violate "clearly established" statutory or constitutional rights of which a "reasonable person" would have known at the time the incident occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the United States Supreme Court discussed the two-step qualified immunity inquiry. The Court directed that, in deciding whether a defendant is protected by qualified immunity, a court first must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. If the facts do not establish the violation of a constitutional right, no further inquiry concerning qualified immunity is necessary. *Id.* If the plaintiff's factual allegations do show a violation of his rights, then the court must proceed to determine whether the right was "clearly established," that is, whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id.* at 201-02. Recently, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the United States Supreme Court concluded that while the two-step sequence identified in *Saucier* "is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.

Here, the voluminous summary judgment record is replete with disputed issues of material fact. Therefore, the Court must determine whether, "[t]aken in the light most favorable to [Plaintiff], . . . the facts alleged show the officer's conduct violated a constitutional right[,]" and whether that right was clearly established at the time of the violation such that reasonable officers in the Defendants' circumstances were aware that what they were doing violated the right. *Saucier*, 533 U.S. at 201-02. Because the Plaintiff has come forward with evidence as to numerous claims against the various Defendants, the following analysis is not an exhaustive evaluation of all claims remaining in the case.

As to Defendants Leon, Kavals, McCall and Bozak, Chapman, Pindel, Rubel, Stanton, Crapis, Beveridge, Donis, and Pofi, Plaintiff comes forward with evidence that Defendants retaliated against him with excessive force for filing grievances, used unprovoked and excessive force against him on numerous occasions, denied medical treatment as punishment, subjected Plaintiff to multiple repeated strip-searches to mock him, planted false evidence in his cell and subsequently filed false charges which were later withdrawn, contrived and filed false criminal charges against Plaintiff for which he was later acquitted by a jury, and provided inadequate library services.

As to Defendants Rustin, Emerick, and Donis, Plaintiff comes forward with evidence that he made verbal and written requests to these Defendants to be separated from Defendants Pindel and Beveridge due to threats and hostilities, but the threats were ignored.

As to Defendants Assistant Warden Emerick, who admitted he was responsible for overseeing the grievance system at ACJ and his direct supervisor, Warden Rustin, Plaintiff comes forward with evidence that ACJ personnel failed to comply with the inmate grievance

system and excessive force reporting policies, and that as a result, ACJ personnel were not held accountable for inmate abuse and conditions of confinement violations.

No reasonable person or officer in the Defendants' circumstances could have believed that what they were doing was in accordance with Plaintiff's constitutional rights established at the time of the alleged violations. That is, the law relating to these constitutional violations was clearly established. *See Lewis v. Casey*, 518 U.S. 343, 354-55 (1996) (extending § 1983 civil rights claimants a First Amendment right of access to courts and the *Bounds v. Smith* requirement that prisons meet minimum standards of access to legal materials, including meaningful access to prison law prison library); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (the Eighth Amendment requires that force be used in a good-faith effort to maintain or restore discipline, not maliciously or sadistically to cause harm); *Hutto v. Finney*, 437 U.S. 678 (1978) (describing the lower court's finding that confinement in unsanitary conditions for an indeterminate period of time was unconstitutional based upon the fact that punishing a prisoner with unsanitary conditions violates the Eighth Amendment ban on cruel and unusual punishments); *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003) (planting contraband in an inmate's cell in retaliation for filing grievances or complaints against an officer implicates conduct protected by the First Amendment); *Torres v. McLaughlin,* 163 F.3d 169, 173 (3d Cir. 1998) (recognizing that § 1983 malicious prosecution claims may be brought for conduct that violates the Fourth Amendment, the Procedural Due Process Clause, or other explicit text of the Constitution); *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993) (deliberate indifference under the Eighth Amendment exists when prison officials intentionally deny or delay necessary medical care for non-medical reasons).

Therefore, as to the above Defendants, it is respectfully recommended that Defendants' Motion for Summary Judgment on the issue of qualified immunity be denied.


6.   MUNICIPAL LIABILITY

Defendants argue that summary judgment should be granted in favor of all municipal Defendants because Plaintiff fails to demonstrate that any policy or custom of the municipal Defendants caused a constitutional violation.  Plaintiff responds that his municipal liability claims survive because record evidence presents disputed issues of material fact.

In *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983.  In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, that is, through application of the doctrine of respondeat superior.  Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell*, 436 U.S. at 694.  The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible.  *Id*.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation.  *Id*. at 690-91.  A municipal policy is made when a decision-maker issues an official proclamation or decision.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).  A custom or practice, however, may consist

of a course of conduct so permanent and widespread that it has the force of law. *Andrews*, 895

F.2d at 1480. To establish municipal liability based upon a custom or practice, the plaintiff must

demonstrate that the decision-maker had notice that a constitutional violation could occur, and

that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of

Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Finally, Plaintiff must show a causal connection

between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*,

915 F.2d 845, 850-51 (3d Cir. 1990). That is, a plaintiff must demonstrate an "affirmative link"

or "plausible nexus" between the custom or practice and the alleged constitutional deprivation.

*Bielevicz*, 915 F.2d at 850-51. "As long as the causal link is not too tenuous, the question

whether the municipal policy or custom proximately caused the constitutional infringement

should be left to the jury." *Id.* at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir.

1981), *cert. denied*, 455 U.S. 1008 (1982)).

Here, Plaintiff comes forward with evidence that Defendants failed to follow the ACJ's

Use of Force policy. The policy provides in relevant part as follows:

A. It is the policy of the Allegheny County Jail:
   1. That the use of force is authorized to prevent escapes, to
      recapture an escapee, to prevent death or injury to staff,
      inmates and others, to prevent an Act of crime, to protect
      property, and to enforce the rules and regulations of the
      Allegheny County Jail (ACJ);
   2. When force is used, the least amount of force reasonably
      necessary to achieve the authorized purpose is to be used
      and the use of force will stop once control is achieved;
   3. That use of force is not authorized as a means of
      punishment, abuse, to inflict personal injury, harassment or
      as revenge;
   4. To report, document and review all incidents of use of
      force and to videotape planned uses of force;
   5. That all employees shall receive training regarding the
      contents of this policy.
                              . . .
   REPORTING

A. Any staff member who uses physical force is required to report such use of force to the Shift Commander as soon as possible.
B. The Shift Commander is required to report the incident to the Warden's Office, or other appropriate staff as directed as soon as possible.

(Use of Force Policy, ECF No. 468-16 at 2, 4.) The Use of Force Policy also contains detailed provisions regarding the documentation of use of force events including written reports from the person who applied the force and from all who witnessed or were involved in the incident. The policy also requires that the Shift Commander prepare an incident report. (Use of Force Policy, ECF No. 468-16 at 5.)

Here, Defendants have failed to produce any Use of Force Reports in discovery which, according to Plaintiff, suggests that the reports were not prepared.[9] Plaintiff argues that noncompliance with the Use of Force Policy produced a culture of inmate abuse because corrections officers knew that use of force would go undocumented, and therefore, officers would not be held accountable for excessive force. Plaintiff also points to information provided to the FBI in January 2011 by the former captain of Internal Affairs, Thomas Leicht, Jr., who indicated the following concerning Defendant Assistant Warden Emerick: "Emerick had an old school philosophy, and Leicht got the impression that Emerick believed that it was acceptable to abuse inmates." (FBI Interview of Thomas Leicht, Jr., ECF No. 468-19 at 7. *See also* Leicht Dep., ECF No. 468-19 at 45.) Clearly, Plaintiff has raised a disputed issue of material fact as to whether the ACJ had a custom or practice of condoning excessive force by failing to comply with its own use of force procedures.

---

[9] Defendants do not dispute that the Use of Force Policy was in effect at ACJ during the relevant time period.

In addition, as discussed at length, *supra* Section II.B.1., Plaintiff comes forward with evidence that Defendants failed to follow their own grievance policy. The 1996 Inmate Complaint System provides in relevant part as follows:

GENERAL PROVISIONS

. . .

C. No inmates shall be disciplined for filing a complaint or otherwise pursuing a remedy in the complaint system.

. . .

D. Inmates writing the complaint shall be advised in writing within forty-eight (48) hours of receipt of said complaint, excluding Saturdays, Sundays and holidays.

E. The Unit Manager shall assign a complaint file number and shall maintain a ledger with the complaint numbers. He shall have broad flexibility and discretion in dealing with a complaint. He shall interview the inmate filing the complaint and shall investigate and conduct interviews as he deems appropriate. The complaint shall be answered within seven (7) working days of receipt of said complaint.

. . .

H. If not satisfied with an answer from the Unit Manager, the complainant may appeal to the Warden in writing on the form provided. Enclose the original complaint and the Unit Manager's disposition. The warden shall approve, disapprove or alter the findings in writing within nine (9) working days, excluding Saturdays, Sundays and holidays.

I. If not satisfied with the warden's response, the complainant may appeal by mail to the Prison Board of Allegheny County, which will appoint a member of the Board to address the complaint. . . . The member of the Prison Board appointed will answer the appeal within ten (10) working days, excluding Saturdays, Sundays and holidays. He may affirm, modify, or reverse any decision previously made. The decision shall be binding.

(1996 Inmate Complaint System, ECF No. 468-6 at 6-7.)

In discovery, Plaintiff repeatedly sought grievance records from ACJ. Deputy Warden Emerick, however, testified that ACJ officials "mistakenly lost" ten years of grievance records

from 1996-2006.  (Emerick Dep., ECF No. 468-3 at 30-31.)  Emerick further testified that he had

no documentation that grievance ledgers were actually maintained or ever in existence prior to

2007.  (Emerick Dep., ECF No. 468-3 at 32.)

Again, Plaintiff has raised a disputed issue of material fact as to whether the ACJ had a

custom or practice of ignoring inmate grievances which functioned as tacit approval of the

corrections officers' alleged unconstitutional conduct.  Therefore Defendants' Motion for

Summary Judgment on the issue of municipal liability should be denied.


### 7.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

Finally, Defendants move for summary judgment on the issue of exhaustion of

administrative remedies.  Defendants argue that ACJ had an administrative remedy in place at

the time of Plaintiff's incarceration, but Plaintiff failed to exhaust his administrative remedies.

Plaintiff responds that his administrative remedies were unavailable and therefore, exhaustion is

not required.

Through the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat.

1321 (1996), Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an

action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law,

until such administrative remedies as are available are exhausted.  Specifically, the act provides,

in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under
> [42 U.S.C. §] 1983, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e (a).  Exhaustion is required under this provision regardless of the type of

relief sought and the type of relief available through administrative procedures.  *See Booth v.*

*Churner*, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes. *See Porter v. Nussle*, 524 U.S. 516, 532 (2002). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies prior to filing the action. *See Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* at 93 (quoting *Porter*, 534 U.S. at 525). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal." *Id.* at 83; *see also Spruill v. Gillis*, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See, e.g.*, *Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000); *Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008); *Jetter v. Beard*, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception.  If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement.  *Robinson v. Superintendent Rockview SCI*, ___ F.3d ___, No. 14-2994, 2016 WL 4010438, at *5 (3d Cir. July 27, 2016) ("SCI Rockview rendered its administrative remedies unavailable to [inmate] when it failed to timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim."); s*ee also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available").  However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *Davis*, 49 F. App'x at 368; *see also Brown v. Croak*, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); *Camp*, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts.  Thus, an inmate cannot excuse a failure to timely comply with

these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. *Harris*, 149 F. App'x at 59. Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. *Davis*, 49 F. App'x at 368. Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. *Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. *Oliver v. Moore*, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Recently, the United States Court of Appeals for the Third Circuit held that "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013). The Court of Appeals noted that "[a]lthough the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." *Id.* (internal citations omitted) (citing *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

Here, the summary judgment record reveals that Plaintiff's administrative remedies were unavailable to him. The evidence of record shows that, during the relevant time period, ACJ officials simply refused to follow its own procedures regarding the inmate grievance system when invoked by Plaintiff. As discussed at length, *supra* at II.C. 1. & 6, Plaintiff continued to file grievance upon grievance, and complained orally and in writing to supervisors, when his efforts to employ grievances procedures were invariably met with no response. *See Robinson*,

2016 WL 4010438, at *5.  Consequently, the Court respectfully recommends that the District Court find, as a matter of law, that Plaintiff's administrative remedies were unavailable to him.

In light of the above, Defendants' Motion for Summary Judgment for failure to exhaustion administrative remedies should be denied.

### III. CONCLUSION

It is respectfully recommended that the Motion for Summary filed by moving Defendants Beveridge, Bozak, Chapman, Crapis, Donnis, Emerick, Kavals, Leon, McCall, Pindel, Pofi, Rubel, Rustin, and Stanton (ECF No. 456) be denied.  The motion should be granted as it relates to Defendant Onorato.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall

have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: August 1, 2016                                BY THE COURT:

                                                     s/Lisa Pupo Lenihan
                                                     LISA PUPO LENIHAN
                                                     United States Magistrate Judge

cc: All counsel of record
    Via electronic filing